298 F.2d 918
 Joseph ALEXANDERVICH, Plaintiff-Appellee,
v.
GALLAGHER BROTHERS SAND & GRAVEL CORPORATION, Defendant-Appellant.
Joseph ALEXANDERVICH, Libelant-Appellee,
v.
THE Oil Screw CONSULTOR II, her engines, etc., and Motor Tug Consultor, Inc., Respondents-Appellants, and
Gallagher Brothers Sand & Gravel Corporation, Respondent-Impleaded-Appellant.
 No. 209.
 No. 210.
 Docket 27222.
 Docket 27223.
 United States Court of Appeals Second Circuit.
 Argued November 29, 1961.
 Decided December 28, 1961.
 
 Edward J. Behrens, New York City (Gay & Behrens, New York City), for appellee.
 Thomas J. Irving, New York City (Foley & Martin, New York City), for appellants.
 Before CLARK, FRIENDLY, and KAUFMAN, Circuit Judges.
 KAUFMAN, Circuit Judges.
 
 
 1
 This is a consolidated appeal by (1) Gallagher Brothers Sand & Gravel Corporation, defendant in a civil action, from a judgment awarding Joseph Alexandervich, plaintiff-below, $94,178.00 for personal injuries, and (2) by Motor Tug Consultor, Inc., respondent and claimant of the tugboat Consultor II, and Gallagher Brothers Sand & Gravel Corporation as impleaded-respondent, from a final decree in admiralty awarding Alexandervich, libelant-below, the same amount for the same injuries.
 
 
 2
 The two cases were tried together on the issue of damages by Judge Conger without a jury, defendant-respondents-below having admitted liability. Appellants ask this Court to set aside the judgment and decree on the grounds that, (a) the trial judge committed prejudicial error by admitting evidence of aggravation of a pre-existing injury when no such claim was framed by the pleadings, (b) the damages awarded by the court were based on clearly erroneous findings of fact, and were otherwise improperly calculated under controlling principles of law, and (c) the amount of damages awarded was excessive. Except for certain minor modifications in the computation of damages, we find no reason to disturb the action taken below, and therefore affirm both the judgment and decree as so modified.
 
 
 3
 The facts, as found by the trial judge, are briefly this: On April 28, 1958 Alexandervich was working as a cook in the galley of a tugboat owned by his employer Gallagher Brothers, the "Peter C. Gallagher," when the boat collided with the tugboat "Consultor II" owned by Motor Tug Consultor, Inc. As a result of this accident, Alexandervich was thrown to the concrete deck of the tug, landed on his buttocks causing him to suffer back pains, and also sustained burns in the area of the left inner aspect of the left ankle by scalding. He was taken by ambulance to the United States Public Health Hospital at Stapleton, Staten Island, where he was an in-patient for ten days. He subsequently was given extended treatment as an out-patient, and on August 25, 1959 he received a certificate from the hospital stating that he was "not fit for sea duty permanently." Alexandervich did not engage in any regular work from the date of the accident until late in 1960.[1] At that time, after having taken rehabilitation courses for eight months, he was able to gain employment in the jewelry business in which he earned $40.00 per week.
 
 I.
 
 4
 The first claim of error is predicated on the admission by the trial judge of evidence concerning a degenerative disc disease alleged to have been contracted by Alexandervich approximately two years before the accident involved in these cases. This evidence was introduced by Alexandervich on direct examination of a Dr. Friedman (Tr. p. 91) in order to make out a claim of aggravation of this pre-existing condition as an element of damages. It was taken up again by the court during the cross-examination of a Dr. Kahle (Tr. p. 158). It is true that this claim of aggravation was not alleged in the complaint or the libel, and that it is not indicated in Alexandervich's answers to appellant Motor Tug Consultor's interrogatories. Nevertheless, we find that there has been no showing of prejudice to appellants in the admission of this evidence which would warrant a finding of reversible error. Fidelity & Deposit Co. of Md. v. Krout, 157 F.2d 912, 913 (2d Cir. 1946). Assuming that there was surprise,[2] appellants' remedy was to seek an adjournment of the trial in order to prepare their defense on this issue. This they failed to do and they also refused to accept an offer of adjournment actually made by the court (Tr. p. 163). This was not a jury trial, and it is clear from the record that the experienced and considerate trial judge was prepared to give counsel as much time as he reasonably needed. Furthermore, the record plainly demonstrates that appellants attempted to utilize the testimony concerning the preexisting condition to strengthen their own defense on the issue of causation. They asserted that the substantial damage to the back in fact resulted from the earlier condition (Tr. pp. 119-122, 247-256). Under all these circumstances, we believe appellants cannot now be heard to complain of surprise and prejudicial error.
 
 
 5
 Related to this is appellants' claim that the trial court committed clear error in finding a 60% loss of earning capacity. We find that this contention is without merit. As pointed out in the trial judge's opinion and findings, appellants' medical expert, Dr. Balensweig, did not dispute that Alexandervich had incurred a permanent disability resulting, at least in part, from a compression fracture of the second lumbar vertebra of the spine; and there is no contention that this fracture was not sustained in the accident of April 28, 1958. Dr. Balensweig also agreed that Alexandervich has a residual effect from the fracture which will prevent him from doing any work which requires heavy lifting, and that this is true wholly apart from the degenerative disc disease. While Dr. Balensweig did take issue with appellee's claim of aggravation of the disc condition itself, the doctor's opinion was contrary to that of Alexandervich's four experts and examining physicians. Certainly Dr. Balensweig's testimony on this issue was not conclusive, and merely raised an issue to be determined by the trier of fact.
 
 
 6
 Furthermore, both appellee and Dr. Kahle testified that the pre-existing condition was quiescent until the accident; that the Marine Hospital gave Alexandervich "Fit for Duty" slips after his treatment in 1956, and that appellee had in fact worked without apparent difficulty until 1958 when the accident occurred. It is undisputed that the symptoms relative to the disc condition reappeared six or seven months after the accident and before the fracture healed. In the light of the entire record before Judge Conger it cannot be said that he committed clear error, and it is only for such error that this Court will reverse. Rule 52(a), Fed.R.Civ.P. 28 U.S.C.A., McAllister v. U. S., 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954).
 
 
 7
 Although no medical expert estimated the exact percentage of the physical disability, or the loss of earning capacity which the physical disability caused, the Court, as trier of facts, could reach its own conclusions concerning these matters on the basis of the ample testimony introduced on this subject. Lukmanis v. United States, 208 F.2d 260 (2d Cir., 1953), Smith v. Jugosalvenska Linijska Plovidea, 278 F.2d 176, 179 (4th Cir., 1960). As we have already noted, even Dr. Balensweig admitted that Alexandervich could no longer undertake heavy work. This was buttressed by the opinion of appellee's expert, Dr. Mauer, who testified that Alexandervich could only engage in sedentary work which did not require either the use of his back or extended periods of standing on his feet. There is no method of calculating precisely how much of a man's earning capacity will be impaired in the distant future. This is a disputed issue of fact. On review it is enough that this Court finds substantial evidence to support a reasonable estimate. Carroll v. United States, 133 F.2d 690, 694 (2d Cir., 1943). Judge Conger carefully considered Alexandervich's work capacity. Indeed, he even found that Alexandervich could earn almost double the amount he was then receiving by future employment in the jewelry trade.
 
 II.
 
 8
 Appellants' principal objection to the calculation of the damages stems from the amount awarded for loss of future earnings. The trial court's opinion does not specify the total amount Alexandervich would probably earn in each of the remaining thirteen years of his work expectancy. However, it was found that appellee lost 60% of his earning capacity, and that this amounted to $6,000.00 per year. This we interpret to mean that Alexandervich must have been able to average $10,000.00 in each of the remaining years. The question is whether there is substantial evidence in the record to justify this. We find there is. The evidence shows that Alexandervich would have earned $30.42 per day as of February 1, 1961 five days per week, plus time and one-half overtime for weekends, which according to appellee's undisputed testimony were frequently worked. This amounts to $7,909.20, to which must be added $750.00 as the value of food provided on the tug. When the likelihood of substantial overtime pay is considered, and it is noted that as of February 1, 1962, Alexandervich would have been entitled to an additional $300.00 in wages, and that, in the light of the history of recurrent wage increases, he would very likely receive additional increases in the following eleven years, it is apparent that a finding that he would have averaged $10,000.00 per year in the remaining period of his work expectancy is supported by substantial evidence, and is not excessive. In any event, we should not merely substitute our judgment for that of the trial judge. See Carroll v. United States, supra.
 
 III.
 
 9
 In calculating the food and lodging or "found" recovery, on the other hand, the trial court did err. Alexandervich was injured on April 28, 1958 and spent the following ten days in the Public Health Service Hospital. Since an award for "found" can be made only when actual food and lodging expenses are incurred, Conte v. Flota Mercante Del Estado, 277 F.2d 664, 669-70 (2d Cir., 1960), and no expense was incurred during the period of hospitalization a $53.33 deduction for that period must be made on the basis of the daily "found" rate used by the lower court.[3]
 
 
 10
 During the period May 9, 1958 through August 25, 1959, Alexandervich was entitled to "found," or to maintenance and cure at the contract rate of $8.00.[4] But as the trial court properly held, he could not have a double recovery for "found" and maintenance and cure. Although an improper rate was used below for "found," as will be shown, the actual amount awarded for this period is correct because Alexandervich did have a right to maintenance and cure computed at that same rate.
 
 
 11
 However, from August 26, 1959 through the date of judgment, Alexandervich was entitled only to "found." The trial court calculated this at $8.00 per day, but this amount cannot be substantiated. As the Conte case, supra, makes clear, Alexandervich is entitled only to out-of-pocket expenses incurred for food and lodging which would not have been borne if he were on the tug. For people having homes of their own, as most do, an employer's provision of lodging when the employee is forced to sleep away from home for the employer's convenience, is not an added element of value as against a job paying the same wage and not requiring such absence. Since Alexandervich maintained a home on Staten Island for his family, he had that lodging expense even when he was aboard the tug. Therefore, he is not entitled to so much of the "found" award as is based upon the cost of his lodging at home. He is entitled, however, to a portion of "found" for the cost of his food. There was no evidence to indicate the actual cost of this item, but there was evidence from which the trial judge was entitled to estimate that cost. The union contract required the employer to provide "grub money" valued at $2.07 per day for each crew member's meals while he was aboard the tug. Although this probably represents a wholesale cost, and appellee would have to pay more for his food when purchasing it himself at retail prices, we think that in the absence of evidence of actual costs, the estimate of his food expense should be based on this contract figure. Since Alexandervich was on board the tug only two out of every three weeks, the portion of "found" for this period to which he was entitled amounts to $927.36 (448 days × $2.07), and not to $3,584.00, the amount awarded below (448 days × $8.00). Deducting the difference ($2,656.64) and the $53.33 for the ten days in 1958 when appellee was in the hospital ($2,709.97), from the total amount of "found" awarded below, Alexandervich's judgment, including the amount assessed for costs, is reduced to $91,468.03.
 
 
 12
 Judge Clark forcefully urges in his dissent that the plaintiff is entitled to compensation for lodging as an element of "found," even though it be assumed he maintained a home for his family while he was aboard the tug, and therefore did not incur any additional lodging expense as a result of the accident. However, we do not believe that all the authorities cited in the dissent in support of this contention are apposite. It is noted in an extensive discussion of the subject in 2 Harper & James, The Law of Torts, § 25.22 (1956) that a "double recovery" of this nature has been awarded only in situations where a third person, or the defendant under some statutory scheme, as in United States v. Price, 4 Cir., 288 F.2d 448 (1961), has made payments to the plaintiff to defray expenses caused by the accident. These payments by their very nature were not intended to substitute for tort damages. By an analysis of the nature of the systems under which these payments were made, it was held that they were intended to benefit the plaintiff regardless of any tort recovery. Thus, for example in the Price case, supra, the court pointed out that the retirement benefits received by the plaintiff were "not designed to compensate [him] for particular injuries suffered," but were "entirely separate from the government's acknowledged statutory duty as tortfeasor * * *" (pp. 450-51). "Double recovery" has also been allowed in situations in which plaintiff's expenditures have been partly defrayed by voluntary gifts from third persons upon the assumption that the donor intended the gift to be above and beyond tort recovery. But, in these cases, the expenses defrayed were caused by the accident; the question was then whether these additional payments should be considered in limitation on the defendant's admitted duty to compensate for them.
 
 
 13
 It is clear that neither of these situations is involved here. The more difficult problems faced by the courts in the cases cited in the able dissent are simply not present in this one. In the instant case there were no independent payments made by anyone to the plaintiff. There is therefore no need to consider the effects of such payments. What we have here is a much simpler problem: the ordinary problem of determining the extent of plaintiff's losses in order to award proper tort damages. Of course, it is not disputed that plaintiff must actually sustain these losses in order to recover. Anything else would be a "windfall." See 2 Harper & James, supra, at p. 1354. See also Harris v. Standard Accident & Ins. Co., No. 26892, 2d Cir., Dec. 6, 1961.[5] 297 F.2d 627. Here, the plaintiff's expenses in providing a home for his family are unrelated to the accident; if his employment had continued he would have borne them nevertheless.
 
 
 14
 The dissent also argues that since we accept the $8.00 per day maintenance and cure allowance without regard to actual expenses incurred we should not apply a different standard in computing "found." However, it must be noted that generally a seaman is only entitled to actual expenses incurred for maintenance and cure. Johnson v. United States, 333 U.S. 46, 50, 68 S.Ct. 391, 92 L.Ed. 468 (1948); Field v. Waterman S.S. Corp., 104 F.2d 849, 851 (5th Cir., 1939).
 
 
 15
 In allowing $8.00 per day in situations such as this, the courts are merely taking cognizance of the contract entered into between the employee's union and his employer. See Bartholomew v. Universe Tankships, Inc., supra, 279 F.2d at p. 914.
 
 
 16
 One final point remains. Appellants claim that the total judgment is excessive. Since it has already been demonstrated that the principal portion of that award was to compensate Alexandervich for lost earning capacity, and that this amount was justified, there remains for consideration only the $10,000.00 awarded for pain and suffering. There is no way in which this element of damages can ever be fixed with anything even approaching certainty. The trial judge who heard the evidence and saw Alexandervich thought that an award of $10,000.00 was appropriate. Since Alexandervich was hospitalized and wore a body cast for months after he left the hospital, it is reasonable to conclude that he suffered considerably. Under the circumstances, "we cannot say that, upon an issue so difficult of quantitive determination, [the award] was so plainly out of measure as to be `clearly erroneous,'" Carroll v. United States, supra, 133 F.2d at p. 694, compare Dagnello v. Long Island R. Co., 289 F.2d 797 (2d Cir., 1961), or that we have a definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).
 
 
 17
 Affirmed as modified. Costs on appeal to be paid by appellants.
 
 
 
 Notes:
 
 
 [1]
 The record shows that he did try to work on a tug for three days in July, 1959, but, according to Alexandervich's testimony, he found it impossible to continue because of back pain
 
 
 [2]
 Appellants were well aware that Alexandervich had been operated upon at the Public Health Service Hospital in 1956. This was specifically stated in appellee's answer to respondent's interrogatory, question #9
 
 
 [3]
 The lower court computed "found" at $8.00 per day, for two-thirds of the period in which he was out of work from May 1, 1958 to the date of judgment. The fraction is applied because Alexandervich was aboard the tug only two out of every three weeks
 
 
 [4]
 See Bartholomew v. Universe Tankships, Inc., 279 F.2d 911, 914 (2d Cir. 1960). Appellants had the right to show that the prearranged figure was incorrect but, in the absence of such a showing the figures should stand. See Reardon v. California Tanker Co., 260 F.2d 369, 377 (2d Cir.1958), cert. denied, 359 U.S. 926, 79 S.Ct. 609. 3 L.Ed.2d 628 (1959) (concurring opinion by Judge Waterman on rehearingin banc).
 
 
 [5]
 The example cited in the dissent of a single man being compensated in a greater sum than a married man, under the law as applied by us, does not pose any problem. If a single man suffers greater damages than a married man in a particular case, there is no reason why he should not be so compensated
 
 
 
 18
 CLARK, Circuit Judge (dissenting in part).
 
 
 19
 I agree with all the affirmative award here upheld, but think my brothers definitely in error in ordering a deduction of $2,709.97 from the award on the basis of a limitation of ordinary "found," or board and keep, to keep alone, because plaintiff is assumed to have a home ashore.[1] Since the amount is small, comparatively speaking, it might be easily overlooked. But the issue appears to be a recurring one, and the principle is quite important. I think it requires more serious analysis than it has yet received before it becomes crystallized into an inflexible and unfortunate rule of law.
 
 
 20
 The deduction is held required on the authority of Conte v. Flota Mercante Del Estado, 2 Cir., 277 F.2d 664, 669-670. Actually it represents an extension of that case to new territory, for that dealt with the proper standard or yardstick to measure loss of future earning capacity, while here involved is the sum allowed by the district court for wages lost to the date of judgment. I find so much question about the Conte holding that I would certainly urge at least its contraction, rather than expansion. It is perhaps odd that my brothers cite Conte only in Section III of their opinion, dealing with wages already lost, and not in Section II, where they discuss loss of earning capacity. True, their discussion is consistent with Conte and becomes labored — in the endeavor to sustain a justified award — by the very fact that the united case appears to be exerting its restrictive influence. For in their analysis they computed only $750 per year as the value of food provided on the tug, whereas Judge Conger allowed $1,952 per year for found. Upon Judge Conger's allowance (which I believe to be quite proper), it is easy to sustain the earning capacity award which my brothers are hard put to it to uphold. But thereafter, when they get to the lost wages item of their Section III, they order the deduction for board on the express and sole basis of Conte, contrary to the relevant authorities hereinafter cited prohibiting an exclusion of economic benefits received in addition to wages.
 
 
 21
 The ruling here deduced from the Conte case was there touched upon only briefly in a long opinion dealing with a plethora of issues concerning damages for a permanently injured seaman. It came up on the contention that the district court had overestimated board and lodging aboard ship at $2 per day (i. e., less than the $2.07 here allowed for food alone). Assuming such allowances to be proper on adequate proof, the opinion has little discussion and no citation of authority. As to lodging, its entire discussion is contained in this somewhat hesitant admonition to guide the trial judge on the remand: "It is not apparent that Conte's lodging aboard ship had any pecuniary value since he was married and had two children and presumably was thus required to maintain a home in Buenos Aires in any event." Conte v. Flota Mercante Del Estado, supra, 2 Cir., 277 F.2d 664, 670.
 
 
 22
 From the form of expression and the context it seems doubtful that the court was intending to lay down an inflexible and unchanging rule binding not only in all cases of computation of lost earning capacity, but also in those covering actual wages lost, as my brothers here conclude.[2] In any event, I do not believe the assumed principle can be supported in either case. Since both are here more or less involved, I shall discuss both, turning first to the proper criterion as to lost earning power.
 
 
 23
 As to this problem, the brief statement quoted from Conte would seem hardly applicable, for it appears to be geared to problems of reimbursement of expenditures made. It is anomalous when incorporated into a rule seeking to define a yardstick for measuring the loss of power to earn in the future. It is obviously relevant evidence for the future to consider what success the wage earner has already achieved in the economic struggle, and hence all the gains he has regularly earned or could probably earn are relevant. 4 Restatement, Torts § 924 and comment d (1939); 2 Harper & James, The Law of Torts 1316-1319 (1956). But chance factors of expense depending upon special circumstances of the moment hardly show a diminution of economic earning power, and, if considered, would suggest surprising anomalies. Thus a single man would be accorded greater earning power and greater loss than a married man with a home, while like preference would be shown a man who deserted his family or who foisted them on his relatives, and so on. There seems no justification for the deduction, even when the expenses of the home are actually proven and are not wholly nebulous as here.
 
 
 24
 The relevant authorities support this conclusion. There are no cases upholding the deduction. On the other hand, the current rule is well stated by Judge Medina for the court, thus:
 
 
 25
 "In the event of liability of the shipowner on the negligence and unseaworthiness claims the injured seaman is entitled to recover indemnity for his loss of earnings, past and prospective, for medical expenses reasonably incurred in the past and to be incurred in the future, and also an additional sum on account of his physical injuries and for pain and suffering. In many if not most cases, with some exceptions in the case of harbor craft such as ferries and tugs, the shipowner provides food and a place to sleep, roughly the equivalent of board and lodging ashore. As this board and lodging is part of the compensation earned by the seaman, it is well settled law that the calculation of loss of earnings may be based upon his wages paid in cash, plus the economic gain arising from his receipt of board and lodging."
 
 
 26
 Bartholomew v. Universe Tankships, Inc., 2 Cir., 279 F.2d 911, 916. It is to be noted that Judge Medina states this rule generally and without any limitation based upon the seaman's home life. And except for Conte — which he cites obviously for its bearing upon the general rule as to proof of lost earning power, rather than for this supposed exception — all the cases he cites support the same general statement. See McCarthy v. American Eastern Corp., 3 Cir., 175 F.2d 727, 728, certiorari denied 338 U.S. 911, 70 S.Ct. 349, 94 L.Ed. 561; Smith v. Lykes Brothers-Ripley S.S. Co., 5 Cir., 105 F.2d 604, certiorari denied 308 U.S. 604, 60 S.Ct. 141, 84 L.Ed. 505. See also Jacobson v. United States, D.C.W.D.Wash., 44 F. Supp. 685. In accord is Jones v. Atlantic Refining Co., D.C.E.D.Pa., 55 F.Supp. 17, 22. And highly significant is the analogy of the important cases cited in my next point below which refuse deductions from damage awards for receipts from collateral sources. I conclude as to this phase of the discussion that reduction of a lost-earning-capacity award for supposed home conditions of the wage earner is contrary to sound policy and precedent.
 
 
 27
 Turning now to the reduction of the award for lost wages to the date of trial, it is necessary first to note the anomaly of the result. Thus my brothers approve of the trial judge's award of "found" from May 9, 1958, through August 25, 1959, as maintenance and cure, but deny the lodging expense as a part of wages from August 26, 1959, to the date of judgment (taken as July 1, 1961). If sheer logic compels the deduction in the one case as unaccrued, why not in the other? I assume my brothers are not prepared to face the consequences in confusion and litigation which would result from upsetting the standard rate of $8 per day for maintenance and cure settled by agreement throughout New York Harbor (see note 4 of the opinion); but the reasons justifying leaving that part of the award untouched suggest like treatment in reason and fairness for the wage award.
 
 
 28
 Be that as it may, the precisely formulated rule of maritime damages stated above, which includes in the injured seaman's award the economic value of the board and lodging to which he had been entitled before his injury, would seem to make the conditions of his home life ashore quite irrelevant to the issue of his loss. And that seems to me the clear teaching of the precedents I cite hereinafter. Indeed so clear does this seem to me that in the absence of any precise formulation of their views by my brothers I have difficulty in detecting the compulsion of their abbreviated argument. But apparently they find a logical necessity for the deduction they make in the thought that, since plaintiff maintained a home off the ship (as they assume), the provision of lodging was not an "added element of value" and hence could not be an economic gain within the rule above stated. This is a curious theory, and bears examining. This means that, as in Conte, determination of "economic value" for computation of damages would be made to turn on whether provision of lodging would affect plaintiff's out-of-pocket costs; unless it would, the lodging would be held valueless. This must mean, as my brothers seem to admit, that if the seaman maintained no other home, so that were he not on shipboard his expenses would be greater, lodging on shipboard would be an added element of value and would constitute economic gain. This poses many questions.
 
 
 29
 First, it keys the determination of "value" to such a complex set of fortuitous circumstances that it would seem both unworkable and utterly unfair. For example, while a single seaman apparently receives "value" from the provision of lodging, would this be true if that same seaman normally lived at home and his parents provided him with free lodging? He incurs no out-of-pocket expense for lodging at all. Under the rule as now stated — going beyond the literal terms of Conte — this man must suffer the deduction. To work out all these distinctions depending on collateral circumstances among seamen who look, act, and are paid alike would require a separate trial itself for no sound reason of policy whatever. In fact, the application of the rule here suggests that these complexities will be resolved by the simple device of ignoring them, even if that compounds the inequities of the doctrine. My brothers have here created an absolute rule or irrebuttable presumption that married men with homes do not save a cent by virtue of shipboard lodging; hence their across-the-board reduction of the entire allowance for lodging. It is difficult to see how they can justify paying no heed to the economic facts of the case while applying a rule ostensibly based on economic realities.
 
 
 30
 But second, I have still stronger objections than these of practicality and fairness, however strong these may be. For the reasoning underlying this deduction of lodging seems to me directly at odds with the settled rule of law stated in 4 Restatement, Torts § 924, comment c (1939), that a plaintiff's recovery for loss of earnings is "not reduced by the fact that the plaintiff has suffered no net financial loss as the result of the entire transaction, as where he receives insurance money or an amount equal to his lost wages from his employer or from a friend." This rule directly rejects the notion that the measure of lost wages is limited to changes in plaintiff's out-of-pocket costs. McCormick states clearly that net changes in plaintiff's actual financial picture do not govern the measure of lost wages: "If the plaintiff's employer continues to pay the plaintiff his wages or salary during his disability, as a gratuity, the plaintiff could hardly be said to have lost any wages, but this generosity ought not to lessen the amount which the wrongdoer should pay, and in these cases the courts have insisted that it is the `value' of the plaintiff's time that is the measure of his recovery." (Emphasis supplied.) McCormick, Damages 310 (1935).
 
 
 31
 Applications of this important principle, often termed, rather ineptly, the "collateral source" rule — that compensation to an injured plaintiff is not to be reduced by payments to him because of the injury from a "collateral source"[3] — are numerous. See, e. g., United States v. Price, 4 Cir., 288 F.2d 448 (benefits under the Civil Service Retirement Act); Hudson v. Lazarus, 95 U.S.App.D.C. 16, 217 F.2d 344, certiorari denied 349 U.S. 968, 75 S.Ct. 906, 99 L.Ed. 1289 (medical and hospital services furnished by a veteran's hospital); United States v. Harue Hayashi, 9 Cir., 282 F.2d 599 (social security benefits); United States v. Gray, 10 Cir., 199 F.2d 239 (hospitalization and medical treatment furnished by the defendant); and complete review of the cases in Plank v. Summers, 203 Md. 552, 102 A.2d 262 (hospital and medical care furnished by a naval hospital). Other cases and authorities are cited in United States v. Price, supra, 4 Cir., 288 F.2d 448, by Chief Judge Sobeloff, who points out (as cited cases show) that the defendant himself may be the "collateral source" from which the additional benefit comes; and see also cases collected in 15 Am.Jur. Damages, § 200; 13 A.L.R.2d 355; 19 id. 557; 52 id. 1451; 68 id. 877; 75 id. 885.
 
 
 32
 Hence I believe it clear that damages here must be measured by a yardstick unaffected by plaintiff's actual net financial change, even if known. Out-of-pocket costs should not be the test, but only whether provision of lodging can be objectively considered to constitute economic gain. And quite obviously it can and does; just as it is gain for the single man, as my brothers admit, so it is gain for all. I would therefore affirm the award below in toto.
 
 
 
 Notes:
 
 
 [1]
 There was no finding below on this issue; and the only evidence was plaintiff's own testimony "I live in Staten Island," and "Well, sometimes I wouldn't get home for three weeks and sometimes, if we didn't have too much work, we would tie up on a week end." There was nothing bearing on the nature or ownership of the "home," who lived there, its rental value, and the like. We learn collaterally from a motion for a preference in trial found in the record that plaintiff, his wife, and three minor children have been on relief, furnished by the City of New York, since October 1, 1960. While this shows that plaintiff has a family, it also suggests a doubt that he has a very plush "home." But the extensive assumptions here made without proof or findings and which are basic to my brothers' argument are to me most surprising
 
 
 [2]
 If a principle thus cursorily announced without supporting analysis or authority is to be permanently binding hereafter on the entire court, it means naturally that the broad and undefined generality lays a heavier hand on future decisions than does the carefully formulated and precedent-limited principle
 
 
 [3]
 See 2 Harper & James, The Law of Torts § 25.22 (1956), for discussion of the rule. As often in the law, a striking label may eventually confuse, rather than clarify, by lumping many things like and unlike together. The term becomes particularly inept where the defendant himself is the "collateral source," as noted below in the text