SEA TRADE CORPORATION, as owner
of the M/V TAGALAM, Libellant-
Appellant,

v.

BETHLEHEM STEEL COMPANY, SHIP-
BUILDING DIVISION, Respondent-
Appellee.

No. 315, Docket 27274.

United States Court of Appeals
Second Circuit.

Argued April 11, 1962.

Decided June 18, 1962.

William P. Hepburn, New York City (Dow & Stonebridge, New York City), for libellant-appellant.

Harold R. Medina, Jr., New York City (Cravath, Swaine & Moore, New York City, and Thomas D. Kent, New York City, of counsel), for respondent-appellee.

Before LUMBARD, Chief Judge, and SWAN and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge.

Sea Trade Corporation ("Sea Trade") libelled Bethlehem Steel Company, Shipbuilding Division ("Bethlehem"), in order to recover claimed damages of $199,-801. representing loss of earnings of the motor vessel M/V Tagalam. The amended libel alleged that Bethlehem, while repairing the ship pursuant to a maritime contract, negligently caused the destruction of the Tagalam's stern frame, rendering respondent liable in tort and for breach of a warranty of competence. In addition, the libel charged that Bethlehem was negligent in procuring a stern frame replacement, thereby creating considerable delay and consequent loss of earnings from the use of the Tagalam. A trial was held before Judge Richard H. Levet who awarded judgment to respondent on the grounds (a) that libellant failed to prove its first two claims; (b) that libellant was also barred from asserting those claims by laches; and (c) that libellant's third claim was barred by a waiver clause in its contract with Bethlehem. Upon review of the entire record we conclude that the

District Court's findings of fact were not clearly erroneous, and that Bethlehem was not liable under the terms of the repair contract for any delay in replacing the stern frame. We therefore affirm the judgment entered below.

From the extensive findings of fact made by the trial judge, it appears that the Tagalam was delivered to the Bethlehem shipyard on December 1, 1952, pursuant to a written contract calling for specified repairs, routine overhaul of machinery, inspection of the underwater body in accordance with Coast Guard regulations, and any repairs which might be required as a result of that inspection. After the ship was drydocked, a "walk around" examination was made by representatives of Sea Trade, Bethlehem, the Tagalam's hull underwriters, and the Coast Guard. The inspection revealed, among other things, an inverted "U" or horse-shoe shaped crack about 10½" in length and 1¾" deep, located on the lower port side of the stern frame which supports the rudder. The inspecting party, including Sea Trade's representatives, agreed that the crack could be repaired by being chipped or "veed" out in order to reach sound metal, and then welded in place; and Bethlehem was instructed to proceed accordingly.

Preparations for the repair were immediately undertaken and were found satisfactory by the Coast Guard representative. The welding by Bethlehem employees followed; and, although the evidence is not precise on this point, it probably was performed in the presence of the Tagalam's assistant port engineer George Worms, who died before the trial. Worms had also been a member of the inspecting party. The procedure followed conformed to standard welding and shipyard practice. As it progressed a second crack in the stern frame, 16" long, appeared just below the first one, and was repaired, probably on Worm's authorization. Shortly thereafter two more cracks opened up between the previous ones, and they were also repaired. Sometime during the night of December 2, a loud noise was heard in the vicinity

of the ship; and on the following morning Bethlehem discovered that the stern frame had "let go," there being a 38″ semi-circular crack which shattered the frame beyond repair. The frame was removed from the Tagalam on December 4, and condemned by the Coast Guard on December 5.

In accordance with the Sea Trade's instructions, Bethlehem solicited and secured bids from various foundries, and placed an order with Penn Steel Casting Company ("Penn") on December 11 for a new stern frame. Meanwhile, Sea Trade had provided Bethlehem with a copy of the vessel's original plans. Since the Tagalam was built in Germany, Bethlehem found it necessary to translate the plans into English, and to convert the measurements therein from the metric system to inches and feet. Although Bethlehem's translation was promptly forwarded to Penn, a subsequent comparison with the original stern frame demonstrated the need for certain changes. Penn did not receive a revised translation until December 16, but there was no substantial delay because Penn had not yet completed its pattern for the casting. A new stern frame was delivered to the Bethlehem yards on January 14, 1953. However, it failed to conform with Bethlehem's revised blueprint and the frame was returned. Penn corrected the error and a good casting was delivered on January 28. Although Bethlehem was ready to install the new stern frame on February 4, a tugboat strike intervened and, as a result, the repair was not finished until March 3, 1953, when the Tagalam left the yards.

On October 2, 1953, seven months after the vessel left the shipyard, Bethlehem rendered bills totalling $74,763., which included the cost of the repairs described; and on December 23, 1953, it sent a second bill for still other repairs made to the Tagalam. The bills were approved by the Tagalam's captain and were paid by Sea Trade without protest. No claim was made against Bethlehem prior to delivery of the ship and none was made thereafter until November 23, 1955. On that date an attorney representing the Tagalam's hull underwriters advised an official of Bethlehem by telephone that a claim would be made for some unspecified faulty workmanship. Another telephone conversation was held between the attorney and a representative of respondent in January, 1956, and on May 2, 1956, a letter was sent to Bethlehem advising that claims would be made in connection with the 1952–53 repairs of the Tagalam. Discussions were held in August, 1956, but evidently no agreement was reached. The present action was filed two years later, on July 1, 1958.

Meanwhile, H. E. Drandoff, the Bethlehem general foreman in charge of the repairs on the Tagalam, died in 1958 and George Worms, the Sea Trade representative believed to be present when the repairs were undertaken died in 1956. Furthermore, Bethlehem's records indicating the names of employees who actually performed the welding were destroyed as a matter of regular business practice—six months after Sea Trade had paid for the repairs without protest.

The trial judge made clear findings bearing on the issue of causation and the destruction of the Tagalam's stern frame. He found that the ship's stern struck hard against a dock while docking starboard side in Puerto La Cruz in Venezuela on September 21, 1952, causing a split of approximately 4 feet of cap log on top of the concrete pier. Although there was some indication that the vessel's rivets may have been caulked at the dock, a cursory examination made at that time of the ship's propeller and rudder did not disclose any damage. However, at the "walk around" inspection made at the Bethlehem yards in December, the Coast Guard representative, upon examination of the stern, suggested that there was reason to believe the Tagalam "might have hit a submerged object at some time"; and Bethlehem later discovered that one of the Tagalam's propeller blades was cracked, and that there were several fractures in

the rudder on the port and starboard sides.

Finally, the court found that on January 7, 8 and 9, 1952 the Tagalam encountered heavy weather while en route to England. It experienced gales and very high seas which caused unusual damage, e. g., whistle pulls were blown off the vessel and rivets in her bottom plates were sprung loose. It is not disputed that the contract entered into with Bethlehem resulted, in part, from the need to repair this damage; and the cost of repairs actually made which were attributable to heavy weather amounted to $20,851.

Insofar as further findings are relevant to the issues on appeal, they will be set forth in the discussion which follows.

■ Libellant's allegations of negligence (insofar as it pertained to the damaged stern frame) and breach of warranty involve a single question of fact: did the damage to the stern frame result from the welding performed in Bethlehem's shipyard in December, 1952, or from other causes, e. g., the accident which occurred two months earlier in Venezuela, or, as suggested by expert evidence, the casting's own internal fatigue.

The trial court found that libellant failed to prove that the damage resulted from improper welding. There was no direct evidence on the actual welding operation, largely because Drandoff (the Bethlehem foreman who was in charge) and Worms (the Sea Trade representative believed to have been present) died in the 6 year period between the alleged liability-creating incident and the commencement of this action.

The evidence did show that the December 1, 1952 inspecting party, which included Worms and other Sea Trade representatives, directed Bethlehem to repair the first (horseshoe) crack by the method described above, with the stern frame left *in place*. The Coast Guard representative, Commander Brown, reported that preparations for the repair made in his presence were completed to his satisfaction. He also reported that pre-heating was accomplished in a fashion described by another expert as being in accordance with sound welding technique. While Brown may have known about the pre-heating only through hearsay, there is not a shred of evidence suggesting the facts were to the contrary. Moreover, Brown stated in his deposition that it was his invariable custom not to authorize any welding unless a shipowner's representative was present or otherwise approved. This justifies the inference that Worms, the only Tagalam officer who was available, participated in the decision to weld the new cracks in the same manner as the first, with the stern frame *in place*. Contrary to Sea Trade's argument on appeal that good welding technique necessarily required removal of the stern frame, Cahill, its own expert, admitted that this was a matter of judgment for the welding engineer; and it was brought out that removal was rarely undertaken for what appeared to be such minor repairs. There is no evidence that Sea Trade informed Bethlehem of the Venezuelan accident, or of the improperly welded core plug on the port side of the ship's stern (known to its agent Briggs). As the trial court noted, this was important information insofar as it might have put respondent on notice that "the repair of an apparently innocuous port crack of minor dimensions [required] more than just a routine welding operation."

Libellant did offer the testimony of an expert (Averbach) who, without having seen the original stern frame, delivered a closely guarded opinion that its destruction resulted from the welding operation. The trial court carefully weighed this testimony with the conflicting expert evidence found in the Pittsburgh Laboratory and Sam Tour reports. The Pittsburgh report unqualifiedly attributed the 38″ crack to internal fatigue of an improperly constructed casting built in 1936. The Sam Tour report, resulting from an investigation ordered by Sea Trade and used by libellant to recover for this damage

against its own insurer, offered an alternative or supplemental theory that the crack resulted from a blow (such as that sustained in Venezuela) and the defective welding of the original core plug. On the basis of all the evidence, the trial court concluded that not only was libellant's theory of improper welding unsubstantiated, but that a preponderance of the credible evidence established that the damage was caused by internal fatigue and/or the Venezuelan dock-striking incident.[1] Sea Trade has brought to our attention nothing which would permit us to reverse these findings as clearly erroneous, McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Alexandervich v. Gallagher Bros. Sand & Gravel Corp., 298 F.2d 918, 920 (2d Cir. 1961), and we have discovered nothing upon which to rest a firm conviction that the lower court has erred.[2]

Nor can Sea Trade overcome inadequate proof by means of so-called presumptions. *Res ipsa loquitur* is manifestly inapplicable where the facts suggest that the damage could result from a variety of causes other than respondent's negligence, Prosser, Torts, § 42 (2 ed. 1955); and Bethlehem's status as bailee of the Tagalam merely required it to "go forward with evidence enough to raise doubts as to the validity of the inference" of negligence raised by the damage to the bailment, Commercial Molasses Corp. v. N. Y. Tank Barge Corp., 314 U.S. 104, 111, 62 S.Ct. 156, 86 L.Ed. 89 (1941). The trial court properly found that Bethlehem had satisfied this burden by introducing evidence of internal fatigue and the Venezuelan accident.

Libellant's third cause of action seeks to hold Bethlehem liable for

---

1. Since the court below held that damage to the stern frame resulted from causes other than improper welding, we have no occasion to decide whether it was Bethlehem's burden to prove performance of its warranty of competence, see Pan-American Petroleum Trans. Co. v. Robins Dry Dock & Repair Co., 281 F. 97, 109 (2d Cir.), cert. denied, 259 U.S. 586, 42 S.Ct. 589, 66 L.Ed. 1076 (1922), or whether libellant had the burden of proving negligence as the basis of its cause of action for breach of warranty.

2. The trial court also concluded that libellant was barred from asserting claims relating to the stern frame damage by laches. On appeal Sea Trade does not appear to challenge Judge Levet's reference to Section 49(6), New York Civil Practice Act, which prescribes a three-year limit on actions for negligent injury to property, insofar as it was considered in the discretionary dismissal of libellant's second cause of action (negligence). In Oroz v. American President Lines, Ltd., 259 F. 2d 636, 639 (2d Cir.1958), cert. denied, 359 U.S. 908, 79 S.Ct. 584, 3 L.Ed.2d 572 (1959), this Court stated that in admiralty the running of an analogous state statute of limitations raises a presumption of prejudice which, in the absence of contrary evidence, justifies a finding of laches. Sea Trade does assert that the trial court erred in applying the negligence statute of limitations to its first cause of action which alleges a breach of warranty of competence, arguing on the basis of our

decision in James McWilliams Blue Line, Inc. v. Esso Standard Oil Co., 245 F.2d 84, 87 (2d Cir.1957) that Section 48(1), New York Civil Practice Act, with its six year limitation on contract actions, should have been considered. Judge Levet decided that the cause of action based on a "warranty of competence" involved, in essence, an obligation to exercise due care rather than a promise to effect a certain end; and, properly looking to New York decisions interpreting that state's limitation provisions, determined that New York courts would apply the three year section on the theory that for limitations purposes the action is in effect one for negligence. Blessington v. McCrory Stores Corp., 305 N.Y. 140, 147, 148, 111 N.E.2d 421 (1953); Carr v. Lipshie, 8 App.Div. 2d 330, 187 N.Y.S.2d 564 (1st Dept. 1959). Although these New York decisions, especially Blessington which was not brought to this Court's attention in the James McWilliams case, cast considerable doubt on the validity of the reference to Section 48(1) in that opinion, it is unnecessary to decide whether the trial court correctly rejected it in view of our affirmance on the facts in this case. Moreover, we cannot say in the circumstances present here, that Judge Levet's holding that even if the six year statute were considered, the libellant should still be barred by laches, is an abuse of discretion. Czaplicki v. The Hoegh Silvercloud, 351 U.S. 525, 534, 76 S.Ct. 946, 100 L.Ed. 1387 (1956).

the delay in repairing the Tagalam occasioned by improper construction of the stern frame replacement. We have already recited the series of events which culminated in the solicitation of bids from various foundries for the construction of a new stern frame. The District Court found that Sea Trade actively participated in this transaction; and that although Bethlehem secured the bids and placed an order with Penn, it did so at Sea Trade's instructions.[3] It is apparent from these facts that Bethlehem merely expedited a transaction between Sea Trade and Penn;[4] Bethlehem's obligation to libellant was not to manufacture or produce a new casting but to install one on the Tagalam. Under these circumstances Bethlehem cannot be found to have been a supplier of Marine equipment, and thereby to have impliedly warranted proper construction of the stern frame. See Booth S. S. Co. v. Meier & Oelhaf Co., 262 F.2d 310, 313 (2d Cir. 1958). Similarly, we agree with the court below that Penn was an independent contractor; and that in the absence of evidence that Bethlehem had any right to supervise Penn's manufacture of the casting, or that it actually did exercise such supervision, Penn's negligence cannot be imputed to Bethlehem, as in Person v. Cauldwell-Wingate Co., 176 F.2d 237, 239–240 (2d Cir.), cert. denied, 338 U.S. 886, 70 S.Ct. 189, 94 L. Ed. 544 (1949).

■■ Finally, the trial court found that no part of the delay in replacing the stern frame was attributable to Bethlehem's own participation in that operation. We believe this finding is not clearly erroneous. We also agree with Judge Levet that Bethlehem did not assume responsibility for delay caused by Penn's negligence or the tugboat strike by virtue of its contract to repair the Tagalam. Bethlehem's offer to make such repairs contained the following red-letter clause:

"We will not be liable for damages or delays by strikes, accidents, or events which are unavoidable or not under our control."

Manifestly both Penn's negligence and the tugboat strike were events not under Bethlehem's control. Sea Trade accepted the above condition on Bethlehem's liability and is bound by it.

Affirmed.

---

3. Bethlehem submitted bids on both an overtime and a straight-time basis and followed libellant's instructions as to which bid for the manufacturing of the casting should be accepted. As a result of discussions between libellant's representatives, Briggs, Tsavaris, and Worms, the underwriters' surveyors, and Bethlehem's representatives, it was decided to procure the new casting from Penn, which was a reputable company.

4. Bethlehem's contract required repairs of conditions found on the "walk-around" inspection; and as a result of this inspection Bethlehem was instructed to repair the cracks found in the original frame.