George **BARNES**

v.

**ANDOVER COMPANY, L.P., Appellant.**

No. 86–1508.

United States Court of Appeals,
Third Circuit.

Argued Nov. 27, 1989.

Decided March 30, 1990.

As Amended April 19, 1990.

Rehearing and Rehearing In Banc
Denied April 25, 1990.

William G. Downey (Argued), William Stanley Sneath, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for appellants.

Peter L. Gallagher (Argued), San Diego, Cal., Harold J. Lamy, New Orleans, La., for appellee.

Before SLOVITER and BECKER, Circuit Judges, and LIFLAND, District Judge [*]

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

*Issue*

Maintenance is the payment by a shipowner to a seaman for the seaman's food and lodging expenses incurred while he is ashore as a result of illness or accident. Both parties agree that the issue before us on this appeal is of substantial importance to the United States maritime industry: whether a seaman is bound by the rate of maintenance fixed in a collective bargaining agreement between the seaman's union and a shipowner. If he [1] is not bound, we must also decide whether the prorated expense of his permanent lodging may be included in the rate of maintenance.

The Ninth Circuit, in a divided opinion, held that the collectively bargained rate of $8.00 a day is binding on the seaman not-

---

[*] Hon. John C. Lifland, United States District Court for the District of New Jersey, sitting by designation.

1. The author of this opinion has followed the practice, as a matter of principle, of refraining from using sexist pronouns to characterize non-specific litigants. However, the cases suggest that the employees who will be affected by this opinion are overwhelmingly male. *But see, e.g.,*

*Shaw v. Ohio River Co.,* 526 F.2d 193 (3d Cir. 1975) (maid and cook on towboat); *Mahramas v. American Export Isbrandtsen Lines,* 475 F.2d 165 (2d Cir.1973) (hairdresser on passenger liner). Until the winds of gender equality blow into the maritime industry, the author will, as a concession to reality, refer in this opinion to the employees as seamen.

withstanding the district court's finding that the rate is inadequate to obtain food and lodging. *Gardiner v. Sea–Land Service, Inc.,* 786 F.2d 943 (9th Cir.), *cert. denied,* 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986). Two other circuits recently followed that approach. *See Macedo v. F/V Paul & Michelle,* 868 F.2d 519 (1st Cir.1989); *Al–Zawkari v. American Steamship Co.,* 871 F.2d 585 (6th Cir.1989). The district court in this case held that the contract rate is not binding on the seaman and awarded a maintenance rate based on expenses actually incurred. Because we agree with the district court that the seaman may challenge the bargained rate, we will depart from the position of the First, Sixth and Ninth Circuits. We also agree with the district court that the seaman is not precluded from recovering the cost of his lodging merely because he also incurred that expense when he was at sea. However, because we find that the district court included in its calculation of the amount of maintenance costs not properly encompassed by the seaman's right of maintenance and costs not supported by the record, we will remand for recalculation of the maintenance award to which plaintiff is entitled.

## II.

### Facts and Procedural History

Plaintiff George Barnes, a member of the Seafarers International Union (SIU or Union), was injured on November 5, 1985 while working aboard the *M/V Adonis* in Puerto Rico. He sued defendants Andover Shipping Company and Apex Marine Corporation (for whom Andover Company, L.P. has since been substituted in place of both original defendants) pursuant to the Jones Act, 46 U.S.C.App. § 688(a) (1982), and general maritime law alleging that his injuries were caused by defendants' negligence and the unseaworthiness of the vessel and requested compensatory and punitive damages. He also requested maintenance and cure in the amount of $35.00 a day, an amount in excess of the $8.00 a day provided for by the collective bargaining agreement in effect between the Union and And-

over. The parties settled all claims except Barnes' claim for maintenance from November 5, 1985 until July 4, 1986.

At an expedited hearing before the district court on February 5, 1986, both parties presented evidence on Barnes' living expenses while on and off the ship. The court ordered maintenance at $21.53 a day, which, following a motion for reconsideration, was later reduced to $20.88 to exclude Barnes' expenses for union dues. The district court fixed this amount based on plaintiff's testimony as to the amount of his monthly expenses for gas, electricity, food, homeowner's insurance, toiletries, gas and oil for his automobile, and automobile insurance. After Andover filed a notice of appeal, counsel agreed that the record was inadequate to permit review and jointly moved to remand for supplementation of the record.

Upon remand, the parties submitted evidence to the district court concerning Barnes' living expenses, the bargaining leading up to the SIU collective bargaining agreement, the effect of inflation on the bargained rate of $8, and other information regarding union benefits and procedures. The evidence of Barnes' living expenses provided by Barnes' testimony and the deposition of his sister, Mary Molander, was that Barnes and his sister had a longstanding agreement whereby together they maintained a home in Philadelphia, Pennsylvania. Molander owned the house, which was completely paid for. Barnes usually paid one-half of the utilities and other expenses regardless whether he was ashore or at sea. Molander testified that she used her own savings to pay for plaintiff's share of household expenses after he was injured and before the settlement of his personal injury claim.

The district court issued a second memorandum and order reviewing the new evidence and applicable law. The court held that the $8 contractual rate was unenforceable because maintenance is a right which is inseparable from the seaman's service. It rejected the defendant's argument that the National Labor Relations Act preempts the seaman's right to claim maintenance

above the contractual rate. It also rejected the argument adopted by the Ninth Circuit in *Gardiner,* 786 F.2d at 948–49, that the broad policies underlying our national labor laws require the bargained maintenance rate to be enforced. Finally, the court held that even if the rate of maintenance were a proper subject of bargaining, there was no evidence that the rate of maintenance had been an actual subject of bargaining between the union and the shipowners. The court then stated that it had reviewed the additional evidence concerning plaintiff's expenses, concluded that the amount previously determined was appropriate, and ordered defendant to pay Barnes maintenance in the amount of $20.88 per day. Andover filed a timely appeal.

### III.

#### *The Right of Maintenance*

Maintenance is the living allowance for a seaman while he is ashore recovering from injury or illness. *See Vaughan v. Atkinson,* 369 U.S. 527, 531, 82 S.Ct. 997, 1000, 8 L.Ed.2d 88 (1962). Cure is payment of medical expenses incurred in treating the seaman's injury or illness. *See Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938). The duty to provide maintenance and cure was first introduced into American admiralty law by Justice Story decided in *Harden v. Gordon,* 11 F.Cas. 480, 482–83 (C.C.D.Me. 1823) (No. 6,047), decided on circuit, and was first recognized and defined by the Supreme Court in *The Osceola,* 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760 (1903). The duty was derived from medieval maritime codes. *Id.* at 169, 23 S.Ct. at 484 (quoting and citing the Rules of Oleron, the Laws of Wisbuy, and the Laws of the Hanse Towns); *Aguilar v. Standard Oil Co.,* 318 U.S. 724, 730 & n. 6, 63 S.Ct. 930, 934 & n. 6, 87 L.Ed. 1107 (1943).

The reason for imposing the duty on American shipowners is found in the oft-quoted language of Justice Story:

> Seamen are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour. They are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence. If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment.... If these expenses are a charge upon the ship, the interest of the owner will be immediately connected with that of the seamen. The master will watch over their health with vigilance and fidelity.... Even the merchant himself derives an ultimate benefit from what may seem at first an onerous charge. It encourages seamen to engage in perilous voyages with more promptitude, and at lower wages. It diminishes the temptation to plunderage upon the approach of sickness; and urges the seamen to encounter hazards in the ship's service, from which they might otherwise be disposed to withdraw.

*Harden,* 11 F.Cas. at 483.

Viewing seamen as wards of the admiralty, the Court has emphasized that the right to maintenance and cure must be construed liberally and has consistently expanded the scope of the right. *See Vaughan,* 369 U.S. at 531–34, 82 S.Ct. at 1000–01; *Warren v. United States,* 340 U.S. 523, 529–30, 71 S.Ct. 432, 436, 95 L.Ed. 503 (1951); *Aguilar,* 318 U.S. at 729, 735–36, 63 S.Ct. at 933, 936; *Calmar,* 303 U.S. at 529–30, 58 S.Ct. at 653–54. Thus, today a shipowner is obliged to pay maintenance and cure regardless of any fault on its part; only wilful misconduct on the part of the seaman will deprive him of its protection. *Aguilar,* 318 U.S. at 730–31, 63 S.Ct. at 933–34.

The employer's responsibility for maintenance and cure extends beyond injuries sustained on board ship or during working hours to any injuries incurred in any place while the seaman is subject to the call of duty. *Id.* at 732, 63 S.Ct. at 934; *see also Warren,* 340 U.S. at 529–30, 71 S.Ct. at 436 (seaman on shore leave injured in Italian dance hall entitled to maintenance and cure). The shipowner is obliged to pay maintenance and cure until the seaman has

reached the point of maximum cure, that is until the seaman is cured or his condition is diagnosed as permanent and incurable. *See Vella v. Ford Motor Co.*, 421 U.S. 1, 5, 95 S.Ct. 1381, 1384, 43 L.Ed.2d 682 (1975); *Vaughan*, 369 U.S. at 531, 82 S.Ct. at 1000; *Neville v. American Barge Line Co.*, 276 F.2d 117, 118–19 (3d Cir.1960).

The traditional maritime right to maintenance and cure was recognized in the Shipowners' Liability Convention, 54 Stat. 1693, which was ratified by the Senate and made effective by proclamation of the President on October 29, 1939. *See Farrell v. United States*, 336 U.S. 511, 517, 69 S.Ct. 707, 710, 93 L.Ed. 850 (1949). Article 2 of the Convention places liability on shipowners for sickness and injury occurring during employment. *Id.* at 1695. Article 3 defines maintenance as board and lodging. *Id.* Article 4 of the Convention provides that "[t]he shipowner shall be liable to defray the expense of medical care and maintenance until the sick or injured person has been cured" or has reached the point of maximum cure. *Id.* at 1696. The Convention has been considered by the Supreme Court as reinforcing the traditional maritime right of maintenance. *See Vella*, 421 U.S. at 5–6, 95 S.Ct. at 1384; *Farrell*, 336 U.S. at 517–19, 69 S.Ct. at 710–11; *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 42, 63 S.Ct. 488, 491, 87 L.Ed. 596 (1943).

Historically, maintenance and cure and unearned wages [2] during the recovery or until the end of the contract were the only remedies available to injured seamen. Today they are only part of an array of remedies to which they are entitled.[3] At the beginning of this century the Court granted seamen a damage remedy if their injuries resulted from the unseaworthiness of their ship or a defect in her equipment. *See The Osceola*, 189 U.S. at 175, 23 S.Ct. at 487; *Cortes v. Baltimore Insular Line*, 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932). The Jones Act, enacted in 1920, provides that a seaman who is injured through the negligence of his employer or a fellow employee is entitled to damages. *De Zon v. American President Lines*, 318 U.S. 660–65, 63 S.Ct. 814, 815–17, 87 L.Ed. 1065 (1943). The Jones Act also has been held to provide an action for a seaman against the shipowner for negligence in failing to provide maintenance and cure. *Cortes*, 287 U.S. at 371–72, 375–76, 53 S.Ct. at 174; *De Zon*, 318 U.S. at 665–68, 63 S.Ct. at 817–19 (1943).

There are significant differences between maintenance and the more recent remedies. As the Court has pointed out, "maintenance and cure is more certain if more limited in its benefits." *Farrell*, 336 U.S. at 519, 69 S.Ct. at 212. Although maintenance does not entitle a seaman to a pension or a lump-sum payment to compensate for disability or lost earning capacity, it is available in the absence of any showing of negligence or unseaworthiness, it is not reduced by a seaman's negligence, and it must be provided at the onset of the illness or injury and not only after a judicial finding of liability.

Maintenance is intended to provide for the cost of food and lodging comparable in quality to that the seaman is entitled

---

**2.** The right to the wages the seaman would have earned if he had been able to complete the contractual terms of employment, usually to work until the end of the voyage, has been viewed as incident to maintenance and cure and traditionally considered part of the right. *See* 1B *Benedict on Admiralty* § 52 at 4–83 (7th ed. 1989); 2 M. Norris, *The Law of Seamen* § 26:7 at 15 (4th ed. 1985). The right to unearned wages "springs out of the relationship of ship and seaman, and not the articles of employment" and has the same historical basis as maintenance and cure. 2 M. Norris, *supra*, § 26:7 at n. 34.

**3.** In addition to the remedies discussed in the text, unionized seamen may be entitled to death

benefits, accidental dismemberment benefits, and disability pensions according to the terms of the collective bargaining agreement their union has negotiated on their behalf. It appears from the record that the Seafarers International Union agreement provides that members who are permanently disabled are entitled to a monthly disability pension in an amount ranging from $250 to $1000 depending on the contributions the seaman's employers made to the pension plan, the seaman's wage, and the seaman's length of service. *See* Seafarers' Pension Plan, App. at 294, 298, 301. The record is silent as to Barnes' entitlement to any of these union benefits, but that fact is immaterial to our disposition.

to at sea. *Calmar,* 303 U.S. at 528, 58 S.Ct. at 653; *Cox v. Dravo Corp.,* 517 F.2d 620, 623 (3d Cir.) (in banc), *cert. denied,* 423 U.S. 1020, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975). Since the 1940's most courts have generally awarded $8 a day as maintenance to seamen. 1B *Benedict on Admiralty* § 43 at 4–9, § 51 at 4–74 (7th ed. 1989); G. Gilmore & C. Black, *The Law of Admiralty* 307 (2d ed. 1975). Today, most deep water seamen are unionized and it appears that most collective bargaining agreements incorporate the $8 rate. *See* 1B *Benedict on Admiralty* § 51 at 4–74 (7th ed. 1989); *see generally* Note, *Maintenance & Cure: Contract Right or Legal Obligation?,* 62 Tul.L.Rev. 625 (1988).

However, in the past decade some courts which have been obliged to determine the appropriate rate of maintenance for non-unionized seamen have recognized that the $8 rate is generally inadequate to provide food and lodging, and have awarded higher rates to reflect the actual reasonable costs the seamen incurred. *See, e.g., Morel v. Sabine Towing & Transp. Co.,* 669 F.2d 345, 347–48 (5th Cir.1982) ($20 a day for maintenance in Port Arthur, Texas); *Incandela v. American Dredging Co.,* 659 F.2d 11, 14 (2d Cir.1981) ($26.80 a day for maintenance in New York City); *Caulfield v. AC & D Marine, Inc.,* 633 F.2d 1129, 1132–33 (5th Cir.1981) ($15 a day for maintenance in New Orleans). As noted above, in those cases where the courts have set the rate of maintenance for unionized seamen, they have generally limited the award to the amount specified in the union contract regardless of actual reasonable expenses. *See Macedo,* 868 F.2d at 522; *Al–Zawkari,* 871 F.2d at 588; *Gardiner,* 786 F.2d at 948–50. It is these latter holdings which the district court found are inconsistent with a seaman's historical legal right to maintenance.

## IV.

### *Effect of Collective Bargaining Agreement*

#### A.

##### *The Gardiner Approach*

Andover argues that the district court erred as a matter of law in holding that the rate of maintenance established in the collective bargaining agreement was not enforceable as to a unionized seaman such as Barnes. It argues that the historical basis for providing maintenance and cure is at odds with the contemporary reality for unionized seamen, that maintenance and cure is a contractual obligation subject to negotiation, that labor law governing collective bargaining preempts the maritime law of maintenance, that national labor policy requires enforcement of the collective bargaining agreement, and that the collective bargaining process contained sufficient *quid quo pro* for the low maintenance rate.

Andover relies primarily on the opinion of the Court of Appeals for the Ninth Circuit in *Gardiner v. Sea–Land Service, Inc.,* 786 F.2d 943 (9th Cir.), *cert. denied,* 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986), and the decisions of the First and Sixth Circuits that have followed *Gardiner's* lead. Although *Gardiner* and its progeny enforced the contract rate of maintenance on the basis of national labor policy, the *Gardiner* court held that federal labor legislation has not preempted the maritime law of maintenance. The court held that the contractual rate should be binding so long as the collective bargaining process has been fair and the rate of maintenance has been subject to real negotiation. *Id.* 786 F.2d at 949.

The Courts of Appeals for the First and Sixth Circuits adopted the majority's reasoning *in toto. See Macedo v. F/V Paul & Michelle,* 868 F.2d 519, 522 (1st Cir.1989); *Al–Zawkari v. American Steamship Co.,* 871 F.2d 585, 588 (6th Cir.1989). The Sixth Circuit opinion stressed that the rate of maintenance can be set by the collective bargaining agreement, but that the right to maintenance cannot be entirely abrogated by contract. *Al–Zawkari,* 871 F.2d at 588. In addition, the First Circuit, which awarded a seaman only the $10 a day provided in his union contract, distinguished the situation of a nonunionized seaman, and stated, "[a]n attempt to limit an individual seaman in this important right would be contrary to

the principles on which it was established." *Macedo,* 868 F.2d at 522.[4]

The major premise of Andover's arguments that the labor laws preempt the maritime right of maintenance for unionized seamen or that national labor policy requires enforcement of the collectively bargained for rate is that the right to maintenance is contractual. That premise is questionable.

### B.

### *Nature of the Right to Maintenance*

As the Supreme Court has noted, "the seaman's right was firmly established in the maritime law long before recognition of the distinction between tort and contract." *O'Donnell v. Great Lakes Dredge & Dock Co.,* 318 U.S. 36, 42, 63 S.Ct. 488, 491, 87 L.Ed. 596 (1943). Although the Court has, at times, used language normally associated with contract to describe the right, *see Aguilar v. Standard Oil Co.,* 318 U.S. 724, 730, 63 S.Ct. 930, 933, 87 L.Ed. 1107 (1943) (maintenance is "an implied provision in contracts of maritime employment"), the Court has stressed that maintenance "differs from rights normally classified as contractual." *Vaughan v. Atkinson,* 369 U.S. 527, 532, 82 S.Ct. 997, 1000, 8 L.Ed.2d 88 (1962). In referring to the duty of maintenance and cure, the Supreme Court stated, "Contractual it is in the sense that it has its source in a relation which is contractual in origin, but given the relation, no agreement is competent to abrogate the incident."

*Cortes v. Baltimore Insular Line,* 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932).

Most often the Court has described maintenance as an incident to employment or a right annexed to the employment contract. *Vaughan,* 369 U.S. at 532, 82 S.Ct. at 1000; *De Zon v. American President Lines,* 318 U.S. 660, 667, 63 S.Ct. 814, 818, 87 L.Ed. 1065 (1943); *O'Donnell,* 318 U.S. at 42, 63 S.Ct. at 491. The duty to provide maintenance attaches once the seaman enters the service of the ship, "a duty that no private agreement is competent to abrogate." *De Zon,* 318 U.S. at 667, 63 S.Ct. at 818.

Andover argues that the rationale underlying the right of maintenance, which is predicated on the special status of seamen as "wards of the admiralty," is no longer valid. It is true that almost every case concerning the right to maintenance relies on Justice Story's description of the seaman as "generally poor and friendless, and acquir[ing] habits of gross indulgence, carelessness, and improvidence." *Harden v. Gordon,* 11 F.Cas. 480, 483 (C.C.D.Me. 1823) (No. 6,047), *cited in Vaughan,* 369 U.S. at 531, 82 S.Ct. at 1000; *Aguilar,* 318 U.S. at 728 n. 2, 63 S.Ct. at 933 n. 2; *Calmar S.S. Corp. v. Taylor,* 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938).

Andover is persuasive in arguing that today those seamen who are unionized are neither friendless nor improvident. *See Merchant v. American Steamship Co.,* 860 F.2d 204, 212 (6th Cir.1988) (Nelson, J. dissenting); *Gardiner,* 786 F.2d at 949. The

---

**4.** Andover suggests that no circuit has held that the contract rate is not binding. Shortly before the *Gardiner* decision, the Fifth Circuit reversed a district court's award of $8 a day maintenance, and remanded for a determination of the reasonable cost for food and lodging. *McWilliams v. Texaco, Inc.,* 781 F.2d 514 (5th Cir. 1986). It is unclear whether the district court had relied on a union contract rate, and the Court of Appeals did not discuss whether such a rate would be binding. A district court in that circuit has held that the rate of maintenance may be fixed by a collective bargaining agreement, *Grove v. Dixie Carriers, Inc.,* 553 F.Supp. 777 (E.D.La.1982), but the Court of Appeals has since expressly declined to decide that issue. *See Dowdle v. Offshore Express, Inc.,* 809 F.2d 259, 263 (5th Cir.1987) (holding labor contract cannot completely abrogate right to unearned

wages). We also note that the Second Circuit, in holding that the maintenance paid should not be deducted from Jones Act damages, stated that the $8 maintenance rate "fixed in the collective bargaining agreement was a fair and proper pre-estimate which neither party could repudiate. Hence, the defendant could not be heard to say that when it paid plaintiff the agreed upon amount it had overpaid him." *Reardon v. California Tanker Co.,* 260 F.2d 369, 376 (2d Cir.1958) (in banc) (per curiam), *cert. denied,* 359 U.S. 926, 79 S.Ct. 609, 3 L.Ed.2d 628 (1959). Judge Waterman, concurring, noted that the court would not necessarily find the bargained for rate binding in all situations and emphasized that in this case the seaman had not contended that the $8 rate was insufficient. *Id.* 260 F.2d at 377.

record in this case shows that the Seafarers International Union, to which Barnes belongs, has obtained for its members overtime and premium pay, vacation allowances, disability pensions, and amenities such as televisions, washers and dryers, coffee breaks, and midnight lunches. *See also Gardiner,* 786 F.2d at 949. Furthermore, the adjectives "friendless" and "helpless" were generally used to describe sailors in foreign ports. Now under union contracts ill or injured seamen are quickly repatriated. *See id.*

The changed circumstances of the unionized seaman may undercut the rationale supporting the traditional right to maintenance and cure, at least for unionized seamen. However, the Supreme Court has shown no inclination to depart from its long-established solicitude for seamen. Until it does so, we see no basis to assume that the emergence of powerful seamen's unions, a development concerning which the Court has full knowledge, *see, e.g., Oil, Chemical & Atomic Workers Int'l Union v. Mobil Oil Co.,* 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976); *American Radio Ass'n v. Mobile Steamship Ass'n,* 419 U.S. 215, 95 S.Ct. 409, 42 L.Ed.2d 399 (1974); *Benz v. Compania Naviera Hidalgo,* 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957), justifies our ignoring the Court's clear and frequent pronouncements that seamen remain wards of the admiralty. *See, e.g., Oil, Chemical & Atomic Workers Int'l Union,* 426 U.S. at 421, 96 S.Ct. at 2147 (Powell, J., concurring); *U.S. Bulk Carriers, Inc. v. Arguelles,* 400 U.S. 351, 355, 91 S.Ct. 409, 411–12, 27 L.Ed.2d 456 (1971); *Cox v. Roth,* 348 U.S. 207, 209, 75 S.Ct. 242, 243, 99 L.Ed. 260 (1955).[5]

Moreover, Andover's claim that maintenance is contractual is beset with inconsistencies. A contractual right can, of course, be contracted away. Supreme Court cases, however, make it clear that the shipowner could not contract with an individual seaman to abrogate maintenance completely. *See De Zon,* 318 U.S. at 667, 63 S.Ct. at

818; *but cf. Garrett v. Moore–McCormack Co.,* 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942) (individual seamen may execute release of maintenance right after injury occurs where shipowner shows was fairly bargained). Furthermore, Andover concedes that even the union could not do so. Abrogation, however, is an imprecise concept in this context. Andover acknowledges that a union contract could not change the maintenance rate to $2 a day, which Andover characterizes as abrogation. We fail to see why retaining the 1952 rate of $8 a day when $8 a day in 1952 dollars would have a value of $32.24 in 1985, *see* App. at 311, is not a comparable abrogation. Moreover, it is anomalous to decide whether a right can be the subject of contract on the basis of the rate reached in the bargaining. We therefore reject the denomination of maintenance as contractual for this purpose. Eschewing labels, we turn instead to the more relevant question, the effect of the labor laws on the traditional right of maintenance.

### C.

#### *The Preemption Issue*

Andover continues to vigorously press before us its argument that the labor laws have preempted the right of maintenance despite the fact that no court, including *Gardiner,* has adopted that theory. It is undoubted that Congress is free to alter maritime law by statute. *O'Donnell,* 318 U.S. at 40–42, 63 S.Ct. at 491. Federal common law is "subject to the paramount authority of Congress." *City of Milwaukee v. Illinois,* 451 U.S. 304, 313, 101 S.Ct. 1784, 1790, 68 L.Ed.2d 114 (1981) (quoting *New Jersey v. New York,* 283 U.S. 336, 348, 51 S.Ct. 478, 481, 75 L.Ed. 1104 (1931)).

Congressional legislation preempts federal common law when it speaks directly to the question at issue, *id.* 451 U.S. at 315, 101 S.Ct. at 1791, and when applying the common law would require "rewriting rules that Congress has affirmatively and

---

**5.** In fact, Barnes argues that seamen continue to need protection because voyages are longer, turn around time shorter, and the ship, particularly a large tanker, is still a lonely, friendless habitat.

specifically enacted." *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978). Although the test for preemption of federal common law is less stringent than the test for preemption of state law because federalism concerns are not at issue, *City of Milwaukee,* 451 U.S. at 316–17, 101 S.Ct. at 1792, the Court has "applied the presumption of statutory preemption somewhat less forcefully to judge-made maritime law than to non-maritime federal common law" because the federal courts have an "expansive role to play in the development of maritime law." *Matter of Oswego Barge Corp.,* 664 F.2d 327, 336 (2d Cir.1981). Thus, statutes "invad[ing]" common law or the general maritime law are read with a presumption toward retaining familiar principles. *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952).

■ Andover points to the following three provisions of the National Labor Relations Act to support its preemption argument: 29 U.S.C. § 185(a) (1982), providing for an exclusive judicial grievance procedure; 29 U.S.C. § 159(a) (1982), requiring unions to be exclusive bargaining agents for their members; and 29 U.S.C. § 158(d) (1982), imposing an obligation to bargain over wages. None of these provisions "speaks directly" to the propriety of bargaining over the rate of maintenance.

Section 301 of the NLRA, 29 U.S.C. § 185(a), provides that "[s]uits for violation of contracts between an employer and a labor organization . . . may be brought in any district court of the United States having jurisdiction of the parties. . . ." Barnes has not brought suit for violation of a contract, merely a suit based on violation of maritime law. *See Gardiner,* 786 F.2d at 947. Moreover, the Supreme Court has held that notwithstanding section 301, a seaman was not bound by the grievance and arbitration process required in the collective bargaining contract and could continue to use the older statutory remedy permitting him to sue for wages in federal court. *U.S. Bulk Carriers v. Arguelles,*

400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971).

Section 9(a), 29 U.S.C. § 159(a), provides that representatives selected by a majority of employees shall be the exclusive representatives of all employees to bargain over rates, wages, and other conditions of employment. This is designed to protect the uncoerced selection of union bargaining representatives by employees. *United Dairy Farmers Coop Ass'n v. NLRB,* 633 F.2d 1054, 1066 (3d Cir.1980). It does not speak to whether maritime rights are an appropriate subject of bargaining or whether the union can make a binding bargain relinquishing maritime rights.

Section 8(d) of the NLRA, 29 U.S.C. § 158(d), requires unions and employers to bargain in good faith "with respect to wages, hours, and other terms and conditions of employment." Although maintenance may be viewed as a condition of employment, this general obligation to bargain does not speak "directly" to whether rights that have been established by maritime law are subject to derogation through bargaining.

While there may be some tension with the general labor policy of enforcing collective bargaining agreements if the bargained-for rate of maintenance is not enforced, this is a far cry from the sort of direct conflict that gives rise to preemption. *See Gardiner,* 786 F.2d at 947–48. When Congress has wished to preempt common law rights, it has done so explicitly. For example, in 1972 Congress amended the Longshore and Harbor Workers' Compensation Act (LHWCA), 44 Stat. 1424, as amended, 33 U.S.C. § 901 *et seq.,* to eliminate the shipowner's traditional liability to the longshoreman for unseaworthiness and the stevedore's liability to the shipowner for unworkmanlike service resulting in injury to the longshoreman. *See Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 262, 99 S.Ct. 2753, 2757, 61 L.Ed.2d 521 (1979).

In *Edmonds,* the Court recognized that in light of Congress' actions, these traditional rights were clearly no longer available to plaintiffs. However, the Court lim-

ited the preemptive effect of the amendments to those areas that Congress explicitly intended to preempt. In deciding whether Congress also intended to eliminate a " 'long-established and familiar princip[e]' of maritime law [regarding the longshoreman's maritime negligence suit against a shipowner] by imposing a proportionate-fault rule," *Edmonds,* 443 U.S. at 263, 99 S.Ct. at 2757 (quoting *Isbrandtsen,* 343 U.S. at 783, 72 S.Ct. at 1014), the Court looked to the legislative history of the LHWCA amendments. Finding no mention of an intention to alter the traditional rule, the Court considered this silence "most eloquent, for such reticence while contemplating an important and controversial change in existing law is unlikely.... At the very least, one would expect some hint of a purpose to work such a change, but there was none." *Id.* at 266–67, 99 S.Ct. at 2759 (footnotes omitted). *See also Pacific Steamship Co. v. Peterson,* 278 U.S. 130, 138–39, 49 S.Ct. 75, 77–78, 73 L.Ed. 220 (1928) (Jones Act provision that seamen may elect to bring a negligence claim does not preempt traditional remedy of maintenance and cure or imply that both claims may not be brought together); *cf. City of Milwaukee,* 451 U.S. at 317–19, 101 S.Ct. at 1792–93 (where 1972 Amendments to the Federal Water Pollution Control Act created a comprehensive regulatory program concerning limits on discharges from treatment plants, there was no basis for Court to impose more stringent limits based on maritime law); *Mobil Oil,* 436 U.S. at 625, 98 S.Ct. at 2015 (where Death on the High Seas Act specifically covers beneficiaries, contributory negligence, survival, and damages, Court found that Congress has spoken "directly" on the question of damages and would not supplement the Act by providing damages for loss of society under maritime law).

Andover has not pointed to any legislative history of the NLRA that would lead us to believe that Congress intended the provisions Andover relies on to "speak directly" to the traditional right of maintenance. Congress is and has been aware of the existence of the right and of its scope. *See Farrell v. United States,* 336 U.S. 511, 519, 69 S.Ct. 707, 711, 93 L.Ed. 850 (1949) (noting that organized seamen pressured Congress against substituting maintenance with a workmen's compensation system). In the words of the Supreme Court in *Edmonds,* we find Andover's failure to point to any legislative history indicating that Congress meant to alter the traditional right to maintenance to be "most eloquent." Because the provisions Andover relies on do not "speak directly" to the question of maintenance, we hold that they do not preempt the maritime duty to pay maintenance.

This does not suggest that seamen are to be considered strangers to labor law. In most instances, national labor law governs the relations between seamen, their unions, and their employers. *See, e.g., NLRB v. Waterman Steamship Corp.,* 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704 (1940). We hold only that in the absence of any provision of the national labor statutes that speaks directly to the question of maintenance, the unionized seaman is entitled to that long-established right.

### D.

### *Effect of National Labor Policy*

Andover argues that even if the National Labor Relations Act is not viewed as preemptive of maintenance, we should follow the decisions of the other courts of appeals that have held that national labor policy in favor of encouraging labor peace through the promotion and enforcement of collective bargaining agreements dictates that the contractually determined maintenance rate be enforced. The majority opinion in *Gardiner,* which contains the most complete exegesis of the theory Andover asks us to adopt, relies on "the broad policies which undergird the labor laws, as well as the nature of the collective bargaining process." *Gardiner,* 786 F.2d at 948. The *Gardiner* court based its decision on the importance of collective bargaining as the keystone of labor relations and " 'the policy of our national labor legislation to encourage both labor and management to negotiate contracts that will effectively regulate

every aspect of their complex relationship.'" *Id.* at 948–49 (quoting *Winston–Salem Printing Pressmen v. Piedmont Publishing Co.*, 393 F.2d 221, 225–26 (4th Cir.1968)). The court held that the collective bargaining agreement should not be repudiated unless the agreement as a whole is viewed as unfair or inadequate.

Although we are also sympathetic with an approach that would encourage the use and reliability of collective bargaining agreements, we know of no basis for permitting such contracts to override a common law maritime right of a seaman that has not been preempted by the labor laws. *Gardiner* cites no authority for a doctrine of "quasi-preemption". We agree with the position of Judge Fletcher in her dissenting opinion in *Gardiner* that a union cannot bargain away the individual seaman's common law right to maintenance by agreeing to a wholly inadequate figure as a daily maintenance rate. *Id.* at 950. We conclude that unless Congress determines that the circumstances giving rise to the need for maintenance have changed and that collective bargaining is now a more appropriate way to deal with the issue of the ill or injured seaman, the common law remedy must remain in full force.

We do not suggest that maintenance is a prohibited subject of bargaining. There may be some benefit to the parties to agree on what they believe is a realistic rate of maintenance with the expectation that the parties would voluntarily abide by that rate and thereby avoid litigation. Judge Fletcher suggested that the bargained for maintenance rate should be left undisturbed unless the seaman can show that it is inadequate to provide him with food and lodging of the kind and quality he would have received aboard the vessel. *See id.* at 951 (citing *Rutherford v. Sea–Land Service, Inc.*, 575 F.Supp. 1365 (N.D.Cal.1983)). We need not decide in this case whether this position is consistent with the conclusion that the NLRA does not preempt the right of maintenance because Barnes met his

common law burden of producing evidence, credited by the district court, that the $8 rate was insufficient to provide him with food and lodging. We can take judicial notice that in Philadelphia, as in San Francisco, $8 a day is ordinarily inadequate to provide food and lodging. *See Rutherford,* 575 F.Supp. at 1370. In fact, the union contract itself provides that when rooms are not available for the crew an allowance of $20 per night is paid when the ship is in port, as well as $17 a day for food. App. at 170. *See Harper v. Zapata Off–Shore Co.,* 741 F.2d 87, 91 (5th Cir.1984) (looking to similar contractual provisions as a basis for determining rate of maintenance).

■ In any event, we conclude that it is inconsistent both with the traditional doctrine of maintenance and with our rejection of preemption of maintenance by the labor laws to hold that the maintenance rate set in the collective bargaining agreement is binding on a seaman who can show higher daily expenses.[6]

### V.

*Calculation of the Rate of Maintenance*

■ Having determined that Barnes is not bound by the $8 a day maintenance rate provided in the union contract, we must reach the second issue presented by this appeal, whether the daily maintenance rate set by the court impermissibly included items of permanent lodging.

In reaching its award of $20.88 a day the district court added together the monthly expenses Barnes testified he incurred and divided the total by 30 to reach a daily rate. The district court referred to Barnes' testimony that his share of the monthly household expenses was $44 for gas, $45 for electricity, $225 for food, and $50 for homeowner's insurance, and that he incurred expenses while on shore of $32 for gas and oil for his automobile, and $50 for automo-

---

**6.** In light of this conclusion, we do not reach Andover's argument that the district court erred in concluding that there was insufficient evidence of *quid pro quo* bargaining on the mainte-

nance rate. Nothing in this opinion is intended to reflect on the good faith of the union in bargaining on behalf of the seamen.

bile insurance.[7] The district court also referred to testimony that Barnes incurred expenses of $180 for laundry, toiletries and other essentials, but this was apparently an error because the only testimony in the record concerning these items is Barnes' testimony that he spent $16–20 a month on toiletries. App. at 48. If $18 instead of $180 a month is included for the category of laundry, toiletries and essentials, the daily rate calculated using the district court's method would be $15.46. At the oral argument before us, counsel for Barnes conceded that the maintenance rate awarded was too high, apparently recognizing the clerical error, and stated that the correct amount should be between $15 and $16 a day.

Andover does not take issue with the specific figures. Its objection is more basic, because it contends that the seaman is entitled only to the expenses he was put to as a direct consequence of being forced to live ashore during his recuperation. It argues that a seaman who maintains permanent lodging whether he is at sea or ashore should not be entitled to recover for the prorated cost of the permanent lodging during the period of maintenance. Barnes' permanent expenses which would be eliminated are thus the costs for gas, electricity, and homeowner's insurance.

■ Because maintenance is intended to substitute for the food and lodging that a seaman enjoyed at sea, it is established that the seaman is entitled only to expenses actually incurred. *Johnson v. United States*, 333 U.S. 46, 50, 68 S.Ct. 391, 393, 92 L.Ed. 468 (1948); *Shaw v. Ohio River Co.*, 526 F.2d 193, 200 (3d Cir.1975); *Stankiewicz v. United Fruit S.S. Corp.*, 229 F.2d 580, 581 (2d Cir.1956). Thus, if a seaman is not charged for hospitalization or lives with his family without incurring any expense or liability for his care, no maintenance is due. *See Johnson*, 333 U.S. at 50, 68 S.Ct. at 393; *Nichols v. Barwick*, 792 F.2d 1520, 1523–24 (11th Cir.1986); *Curry v. Fluor*

*Drilling Services Inc.*, 715 F.2d 893, 896 (5th Cir.1983); *Mahramas v. American Export Isbrandtsen Lines*, 475 F.2d 165, 172 (2d Cir.1973). On the other hand, a seaman living with his family is entitled to maintenance if he shows that he paid his family for his room and board or that he had promised that he would and was obliged to do so. *See, e.g., McCormick Shipping Corp. v. Duvalier*, 311 F.2d 933, 934 (5th Cir.1963) (per curiam); *Flower v. Nordsee, Inc.*, 657 F.Supp. 235, 236 (D.Me. 1987).

In this case, Barnes paid half of certain fixed expenses such as home insurance and utilities whether he was ashore or at sea pursuant to a long-standing arrangement with his sister. It is irrelevant that while Barnes was recuperating his sister advanced the amount for some of Barnes' expenses because these advances were made in the expectation that she would be repaid. Thus, Barnes satisfies the requirement that the expenses or liability for the expenses be incurred.

The more difficult question is whether he is entitled to maintenance for the fixed costs while he was ashore which he incurred even when he was at sea, or whether he is limited to the incremental expenses incurred, such as food, laundry and the additional cost of utilities attributable to his presence. There is no Supreme Court precedent on point, and we have found no case, nor have the parties cited one, analyzing the precise issue. Some parallel may be found in the decisions awarding maintenance for land-based seamen, such as tugboat or ferry operators, who work aboard their ships during the day and regularly sleep and eat ashore. Although these seamen, when ill or injured, are not cast ashore like the "blue water sailors" because they need only repair to their customary dwellings, courts have held that they are also entitled to daily maintenance. *See* 1B *Benedict on Admiralty* § 51 at 4–79 to 80 and cases cited therein (7th ed. 1989).

---

7. Molander's testimony as to specific expenses, which she gave by reference to available bills, was at some variance from Barnes' testimony. The district court accepted Barnes' figures, which surprisingly did not include any amount for the telephone or water expenses which Molander, but not Barnes, testified to.

In a full discussion of the propriety of an award of maintenance in these circumstances, Judge Alvin Rubin, then a district court judge, rejected the notion that maintenance would be payable only for services on board which the disabled seaman missed. He stated:

To deny [maintenance to a seaman] because he does not receive lodging and meals aboard ship raises problems that would distort the simple lines of the maintenance remedy.... Indeed, the rationale that maintenance is allowable only when meals would have been served aboard challenges the now well settled doctrine that the disabled seaman is entitled to be paid maintenance beyond the end of his voyage, for were maintenance to be allowed only for those days during which the ship would have served him meals, it would end when the voyage was over.

*Hudspeth v. Atlantic & Gulf Stevedores, Inc.*, 266 F.Supp. 937, 943 (E.D.La.1967) (footnote omitted).

As the Court of Appeals for the Second Circuit noted, "[w]e know of no authority, however, for holding that a seaman is not entitled to the traditional privileges of his status merely because his voyages are short, because he sleeps ashore, or for other reasons his lot is more pleasant than that of most of his brethren." *Weiss v. Central R.R. of N.J.*, 235 F.2d 309, 313 (2d Cir.1956).

The Eastern District of Louisiana, which handles a high number of maritime cases, also held that notwithstanding that the seaman incurred the cost of maintaining a home prior to his injury, the continued cost of paying for his lodging during his convalescence is a cost actually incurred and thus includable in maintenance. *DuPlantis v. Willimas–McWilliams Indus.*, 298 F.Supp. 13, 15 (E.D.La.1969). To hold otherwise, the court explained, "would not only do violence to the theory underlying maintenance, which is to provide compensation sufficient to pay for the care of the injured seaman, necessarily including his lodging expense, but would also restrictively define ... the costs actually incurred by

a seaman" contrary to the general rule that seamen's rights should not be read restrictively and that all doubts should be resolved in favor of the seaman. *Id.* at 15 (footnotes omitted).

Many of the reasons given by the courts for awarding maintenance to land-based seamen who, by definition, ordinarily incur their own expenses for food and lodging are also applicable to inclusion in maintenance of the prorated costs of permanent lodging by a blue water seaman: the status of seamen as wards of the admiralty, *Weiss*, 235 F.2d at 313; *DuPlantis*, 298 F.Supp. at 14–15 & n. 3; consistency with maritime tradition, *Weiss*, 235 F.2d at 313; *DuPlantis*, 298 F.Supp. at 14–15, and the need to provide support to those who are ineligible for workman's compensation or other means of support. *Weiss*, 235 F.2d at 313.

Andover relies heavily on *Alexandervich v. Gallagher Bros. Sand & Gravel Corp.*, 298 F.2d 918 (2d Cir.1961), and *Harper v. Zapata Off–Shore Co.*, 741 F.2d 87 (5th Cir.1984), to support its position that a seaman who maintains a home ashore is not entitled to have regularly incurred costs computed in his maintenance award. Neither case provides the support Andover seeks. It is true that in *Harper* the Court of Appeals did not award any lodging benefits because during the period of cure the seaman stayed at his home with his wife and children. The court noted, however, that the record was devoid of any evidence that he incurred lodging expense. 741 F.2d at 91. Thus, *Harper* may merely signify a failure of proof, such as the absence of testimony by the seaman that he paid the rent or mortgage while he was recuperating. Significantly, the court did hold the seaman was entitled to $20 daily maintenance based solely on evidence that the shipowner provided its seamen with a $20 daily allowance for food when it sent them ashore for school or during stormy weather. *Id.*

The other case Andover cites, *Alexandervich*, focuses not on maintenance but on "found," an amount a seaman suing in tort may include in his loss of earnings claim

for the value of the meals and lodging he would have received if he had remained employed as a seaman. A seaman is entitled to "found" in tort only if he incurs expenses for food and lodging. *Id.* at 921. The Court of Appeals held that because Alexandervich, a cook in a tugboat galley, maintained a home for himself and his family on Staten Island, he could not include compensation for lodging as part of his damages but was limited to out-of-pocket expenses incurred for food and lodging which he would not have borne if he were on the tug. *Id.* at 922.[8] However, tort damages, such as "found," are calculated by including the loss of any in-kind income such as room and board which the seamen would have earned. Maintenance, on the other hand, is designed to provide the seamen with funds that he must expend.

We recognize there is some logic in Andover's contention that allowing maintenance for shore-bound seamen constitutes a double recovery. One treatise has stated that "[i]f the life of the law was logic and not experience, it might be assumed that maintenance awards would be denied to shore-based workers who live at home and provide their own sustenance." G. Gilmore and C. Black, *The Law of Admiralty* 305 (2d ed. 1975). One of the principal objections to recovery of permanent lodging costs in maintenance paid to land-based seamen is that their wages, unlike those of deep-sea sailors, are computed with the expectation that they will need to maintain themselves on shore. *But see Crooks v. United States,* 459 F.2d 631, 633 (9th Cir. 1972) (rejecting double recovery argument on historical grounds). *See also Harden v. Gordon,* 11 F.Cas. 480, 483 (C.C.D.Me. 1923) (No. 6047); G. Gilmore & C. Black, *The Law of Admiralty* 305 (2d ed. 1975).

■ Whatever the merits of the double recovery objection for maintenance paid to land-based seamen, that argument is inapplicable to Barnes. Barnes was not shore-bound and Andover does not suggest that his wages were fixed in contemplation of his providing his own food and lodging. Thus, the fact that Barnes chose to use his wages to maintain an on-shore residence rather than on entertainment or on some frivolity should not be used to reduce his recovery, particularly since there is no question here of any double recovery as a result of land-based wages.

We find some guidance in the Supreme Court's decision in *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), where the Court held that a disabled seaman who had been forced to find employment because the employer had failed to pay him the maintenance to which he was entitled could recover the entire maintenance due him without offsetting the amount of his earnings. Although the Court rationalized its decision as designed to preclude any inducement to employers to withhold maintenance as a means of forcing seamen to work, the Court reiterated "the liberal attitude that heretofore has obtained" with regard to maintenance, *id.* at 533, 82 S.Ct. at 1001, and the principle that ambiguities or doubts in regard to maintenance "are resolved in favor of the seaman." *Id.* at 532, 82 S.Ct. at 1000.

Furthermore, the traditional concern for the seaman's well being is applicable to this situation because a seaman is entitled to wages only until the end of the voyage or the end of his contractual employment period. *The Osceola,* 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760 (1903). After that wage obligation lapses he is entitled only to maintenance and cure, unless he has a claim against the employer for negligence or unseaworthiness. Then, if the seaman is deprived of adequate maintenance on the ground that his lodging ex-

---

**8.** The court also held he was entitled to "found" or maintenance but not both. 298 F.2d at 922. This court has also held that when an employee recovers damages under the Jones Act for lost earnings which include both wages and "found," he may not recover maintenance for the same period. *Shaw,* 526 F.2d at 200 (citing *McCarthy v. American Eastern Corp.,* 175 F.2d 727 (3d Cir.1949), *cert. denied,* 338 U.S. 911, 70 S.Ct. 349, 94 L.Ed. 561 (1950)). However, we have not considered whether the non-incremental expenses may be included as an element of "found." There is no claim in the case before us that Barnes received "found" as an element of his settlement with Andover.

pense was not incremental, he has no funds from which to pay for his lodgings. *Cf. Weiss,* 235 F.2d at 313 (holding shorebound seamen to be ineligible for maintenance would create a class of workers ineligible to receive maintenance but also ineligible to receive workman's compensation).

For all of the above reasons, we conclude that blue water seamen who maintain a home ashore are entitled to include in their calculation of maintenance their expenses actually incurred or paid in connection with their permanent lodging, prorated for the period of maintenance. Thus, the district court did not err in including Barnes' share of the monthly gas and electric bills, as well as home insurance.

■■■ On the other hand, we agree with Andover that maintenance should not include Barnes' automobile expenses (gas, oil and insurance) or his toiletries. Barnes testified that he needed the automobile to go to and from the doctor. App. at 48. Although one court has, without discussion, permitted the cost of transportation to medical facilities to be included in the calculation of maintenance, *see Autin v. Otis Engineering Corp.,* 641 F.2d 197 (5th Cir. 1981) (per curiam), we believe that expenses incurred in connection with medical visits are more appropriately considered part of cure.

In addition, because maintenance has traditionally been described as payment for "food and lodging," *see, e.g., Vaughan,* 369 U.S. at 531, 82 S.Ct. at 1000, we see no reason why automobile expenses other than for medical transport should be borne by the shipowner in any category or why toiletries should be included as maintenance.[9] Inasmuch as we have looked to the traditional scope of the right in concluding that the seaman is not bound by the contractual rate, the traditional definition should not be disregarded here. Thus, we conclude that on remand the district court should exclude these costs from the amount of maintenance.

## VI.

### *Summary*

We have determined that the $8 rate of maintenance set forth in the collective bargaining agreement is not binding on Barnes, who proved that his actual expenses were in excess of that amount. We are, of course, aware that this decision creates a division in the circuits. We can find, however, no reason in Supreme Court precedent to lead us to depart from the traditional scope of maintenance in favor of a less than adequate daily rate included in the collective bargaining agreement. If the contract rate is to be viewed as superseding the long-standing maritime rule that actual expenses can be recovered, it must be Congress, and not this court, that makes that policy decision.

We therefore agree with the district court's decision to base its award of maintenance on the expenses Barnes actually incurred. We also agree with the district court that Barnes could properly include as a maintenance expense the cost of the lodging he maintained all year, prorated for the period of maintenance. Such a decision is consistent with the principle underlying the cases awarding maintenance even to land-based seamen. However, because we conclude that Barnes' automobile expenses and toiletries were improperly included in the award of maintenance, we will vacate the district court's order and remand this case to the district court for reconsideration of the amount of maintenance to be awarded based on the record previously made, and for entry of an order consistent with this opinion.

LIFLAND, District Judge, dissenting.

I respectfully dissent from the holding of the majority that the $8 rate of maintenance set forth in the collective bargaining agreement is not binding on Barnes and that there must be a congressional determination that collective bargaining is now a more appropriate way to deal with the is-

---

9. Laundry expenses, ordinarily borne by the ship, would have been includable had there been evidence to support such an award. The seaman has the burden of establishing the expenses incurred. *Curry v. Fluor Drilling Services, Inc.,* 715 F.2d 893, 896 (5th Cir.1983).

sue of the ill or injured seamen, if the collectively-bargained rate is to prevail.

I would reach the same result as the three Courts of Appeals [1] which have considered this precise question and have held that in the collective bargaining context the common law right of maintenance can be measured by an agreement between the employer and the duly-chosen collective bargaining representative of the employees who possess the right. In my view, the majority does not attempt any accommodation of the policies which are in conflict in this case, as those other courts did.

I agree with the majority's conclusion that the right to maintenance does not have its genesis in contract except in the sense that it has its source in a relation which is contractual in origin. I also agree with the conclusion of the majority that the labor laws have not preempted the right of maintenance; it is clear to me, as it is to the majority, that Congress has not spoken "directly" to the traditional right of maintenance in enacting the various laws which comprise the national labor policy.

However, I depart from the view of the majority because it seemingly rejects what to me is an obvious accommodation of the national labor policy and the right of maintenance. The majority reaches the same result that would be reached had Mr. Barnes been a non-union seaman or had there been no mention of the right of maintenance in the collective bargaining agreement, circumstances under which there would be no conflict between the right to maintenance and the national labor policy.

I believe, as did the Courts of Appeal in *Gardiner*, *Macedo* and *Al–Zawkari*, that there is a fair resolution of the conflict between the right of maintenance and the national labor policy where, as here, fair collective bargaining has resulted in a measurement of that right. Collective bargaining has not abrogated the right when it clearly recognizes the right and places a dollar value on the right, in the context of collective bargaining over wages, hours and other terms and conditions of employment which results in a myriad of benefits appropriate to the maritime environment.

While Mr. Barnes will receive the few extra dollars to which he has proven his entitlement, in accordance with the holding of the majority, no other unionized seamen in this Circuit may receive anything without proving their actual expenses, perhaps in a law suit such as Mr. Barnes has commenced. At the very least, a negotiated settlement between the seamen and the employer will be necessary in every case. I fail to see how such a negotiated settlement is materially better for the seamen than the settlement negotiated by their union at no additional expense to the seamen. There is no reason why the seamen themselves, through their unions, cannot in the circumstances presented here be relied upon to protect the common law right to maintenance against abrogation.

In my view, the majority has not striven to accommodate the conflict inherent in the facts of this case. I would do so and reverse, given the lack of any challenge to the Union's discharge of its duty of fair representation.

---

**1.** *Gardiner v. Sea–Land Service, Inc.,* 786 F.2d 943 (9th Cir.), *cert. denied,* 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986); *Macedo v. F/V Paul & Michelle,* 868 F.2d 519 (1st Cir.1989); *Al–Zawkari v. American Steamship Co.,* 871 F.2d 585 (6th Cir.1989).