**Johnnie CLIFFORD, Plaintiff,**

v.

**MT. VERNON BARGE SERVICE, INC., Defendant.**

**No. EV 99–70–C–Y/H.**

United States District Court,
S.D. Indiana,
Evansville Division.

Nov. 16, 1999.

---

Christopher D. Kuebler, O'Bryan & Baun, Birmingham, MI, for Plaintiff.

W. Scott Miller, Jr., Miller & Miller, Louisville, KY, for Defendant.

## ORDER ON PLAINTIFF'S MOTION FOR RETROACTIVE INCREASE OF MAINTENANCE RATE

YOUNG, District Judge.

On July 21, 1999, the plaintiff filed a motion for retroactive increase of maintenance rate. For the reasons stated below, the motion is GRANTED, in part.

The plaintiff filed this action under the general maritime law for injuries he allegedly sustained in the service of the ship while a crew member of the defendant's vessel. The current motion asks this court to establish the appropriate rate of maintenance which the plaintiff is entitled to receive. The Supreme Court of the United States has explained maintenance and cure as follows:

> Among the most pervasive incidents of the responsibility anciently imposed upon a shipowner for the health and security of sailors was liability for the maintenance and cure of seamen becoming ill or injured during the period of their service. In the United States this obligation has been recognized consistently as an implied provision in contracts of marine employment. Created thus with the contract of employment, the liability ... in no sense is predicated on the fault or negligence of the shipowner. Whether by traditional standards he is or is not responsible for the injury or sickness, he is liable for the expense of curing it as an incident of the marine employer-employee relationship.... Only some wilful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection.

*Aguilar v. Standard Oil Co.*, 318 U.S. 724, 730–31, 63 S.Ct. 930, 87 L.Ed. 1107 (1943).

In this motion, the plaintiff also requests retroactive payment of maintenance. The defendant does not dispute that the plaintiff is entitled to maintenance at this time, but challenges the plaintiff's calculation as to the appropriate amount. The defendant also urges the court to conclude that if the plaintiff is entitled to any additional maintenance, the payment of the additional amounts be credited against other amounts which the defendant alleges it has "gratuitously" paid to the plaintiff to date.

### Findings of Fact

The following facts are not disputed:

1. The plaintiff was hired by the defendant on June 25, 1998, and worked until January 15, 1999, at which time he alleges he was injured.

2. The defendant began making payments to the plaintiff in the amount of $56.00 per week as maintenance, and has continued to do so at least through the month of August 1999.

3. The defendant has paid all expenses related to the medical care provided to the plaintiff and reimbursed him for traveling expenses to his medical care providers.

4. The defendant has paid $662.41 per month towards health insurance for the plaintiff and his dependents.[1]

5. The defendant advanced to the plaintiff 17 weeks of an amount equal to two-thirds of his average net weekly wages through May 26, 1999, for a total of $3,666.22.

### Analysis

■ Maintenance is the payment by a shipowner to a seaman for the seaman's food and lodging expenses incurred while he is ashore as a result of illness or accident. *Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).[2] The provision of maintenance is a duty derived from medieval maritime codes. The history of this right was traced recently in the case of *Barnes v. Andover Co., L.P.*, 900 F.2d 630 (3rd Cir.1990). The court in that case does a thorough and comprehensive job of describing the right to maintenance. It is recommended reading for those interested in the subject, but will not be repeated in this opinion. The *Barnes* case also distinguishes the remedy of maintenance from that of other more recent remedies which are provided for seamen who become injured, such as the Jones Act. As that case describes, maintenance is a more *certain* remedy, which is more limited in its benefits.

In this case, the plaintiff is being paid maintenance at the rate of $8.00 per day, a historically recognized rate, and one that is often bargained for under collective bargaining agreements. As the *Barnes* case points out, some courts addressing the issue of the appropriate maintenance rate are obliged to consider such factors as whether seamen are union or non-union, and whether they are "blue water sailors" or are "land-based." In this case, there is

no indication that the plaintiff is governed by the terms of any collective bargaining agreement, and it appears that he is land-based—that is, returns to his home every evening after work as opposed to being left on some foreign shore when injured.

In this case, the plaintiff's request for maintenance includes two components: (1) food, and (2) utilities, including electric, gas and basic telephone charges. The plaintiff alleges that his groceries cost $100.00 per week, and the portion of utility payments at his home attributable to his consumption is $43.29.

■ As to the issue of payment for food, there is no dispute between the parties that this plaintiff is entitled to some payment for food. The parties dispute the appropriate amount. In *Incandela v. American Dredging Co.*, 659 F.2d 11 (2nd Cir.1981), the court noted that a seaman makes out a "prima facie case on the maintenance rate question when he proves the *actual* living expenditures which he found it necessary to incur during his convalescence." *Id.* at 14 (emphasis added). Once he has done so, the burden shifts to the defendant to produce some evidence in rebuttal. In this case, the affidavit of the plaintiff establishes that it costs $100.00 per week to buy his groceries. The defendant has come forward with an affidavit of Stephanie Miller which attaches a copy of a United States Department of Agricultural document entitled "Official USDA Food Plans: Costs of Food at Home at Four Levels—U.S. Average 1999," which indicates that a male in the plaintiff's age group would spend between $28.00 and $54.30 per week on the basis that all meals and snacks are purchased at stores and prepared at home.[3] The plaintiff has not

1. The court finds the affidavit of Diana Billman somewhat unclear as to whether the cost of the coverage for Mr. Clifford himself was $501.73 per month, or whether the cost of the dependent coverage was $501.73.

2. Cure is the payment of medical expenses incurred in treating the seaman's injury or

illness. There does not seem to be any dispute that the defendant has paid cure in this case, and so that concept will not be discussed further.

3. The affidavit also includes an opinion by the affiant that she spends $50.00 per week for groceries for herself. Because this is an affi-

1058

**1058**

filed anything in reply to the defendant's response. In balancing the two pieces of evidence before the court, the court would note that the *Incandela* holding establishes that the prima facie case is made when the plaintiff proves *"the actual living expenditures which he found it necessary to incur during his convalescence."* Because maintenance is intended to substitute for the food and lodging that a seaman enjoyed at sea, it is established that the seaman is entitled only to expenses "actually incurred." *Johnson v. U.S.,* 333 U.S. 46, 50, 68 S.Ct. 391, 92 L.Ed. 468 (1948). It strikes this court that the provision of $100.00 per week is a very general figure, and is not supported by any receipts of any type showing actual monies expended or any method of reaching that number as an appropriate amount for actual food purchase expenses incurred by the plaintiff himself (and not members of his family). This court must therefore conclude that based on the evidence before the court to date, the plaintiff has not carried his prima facie burden of showing the amount of money he has *actually* incurred in expenses for food. Therefore, use of the defendant's suggested $54.30 per week payment is appropriate in this case for the provision of food.

The second category of expense for which the plaintiff seeks is his share of utilities at his permanent residence. The *Barnes* case discusses in some detail whether expenses of maintaining a home ashore are entitled to be included in the calculation of maintenance. That court concluded that at least with respect to "blue water seaman," such expenses that were actually incurred or paid may be included in a payment of maintenance.

 *Barnes* does recognize that one of the principal objections to recovery of permanent lodging costs and maintenance

paid to land-based seamen is that their wages, unlike those of deep sea sailors, are computed with the expectation that they will need to maintain themselves on shore. *Barnes,* 900 F.2d at 643. As the *Barnes* case points out, the United States Supreme Court has continued to view seamen as wards of the admiralty, and that court has emphasized that the right to maintenance and cure must be construed liberally and has consistently expanded the scope of the right. *See Vaughan,* 369 U.S. at 531–34, 82 S.Ct. 997; *Warren v. U.S.,* 340 U.S. 523, 529–30, 71 S.Ct. 432, 95 L.Ed. 503 (1951); *Aguilar,* 318 U.S. at 735–36, 63 S.Ct. 930. Viewed in the light of these cases, this court concludes that it should liberally construe the right to include some utility payments. To do so is to provide the basic necessities of heat and light during the convalescent period. The prompt payment of these amounts as maintenance will assure a reasonable recovery period for the sailor.

Having concluded that utilities may be included as a part of maintenance even for land-based seamen, the question arises as to the appropriate amount in this case. Using the same burden shifting analysis as we have previously applied to food, the plaintiff has come forward with rather generalized requests. The defendant's affidavit is much more specific and is based on actual billing history. Under those calculations, the household expenses per week would include:

(a) electric—$12.77;

(b) gas—$3.98; and

(c) basic telephone—$4.78.[4]

 The further issue arises as to whether these amounts must be reduced because the plaintiff's wife and child reside with him. The court has found no authority concerning whether maintenance must be reduced because of the presence of the

davit of counsel in the case, and under Rule of Professional Conduct 3.7 counsel is not allowed to testify in a case as to a matter at issue on the merits, the court is disregarding this opinion.

4. $20.55 divided by 4.3.

wife and child in the same lodging. The case of *Ritchie v. Grimm,* 724 F.Supp. 59, 1990 AMC 2948 (E.D.N.Y.1989), concluded that reduction was not necessary since it was likely that the plaintiff would pay the same amount if he resided in his apartment by himself. Like that case, this court concludes that the amounts for basic telephone service and basic electrical and gas service is likely to be paid by the seaman regardless of the number of family members present. There is no indication from the nature of the bills, which are rather modest, that the cost of electricity or gas is significantly increased because of the presence of the wife and child. Therefore, in order to provide the basic services to the plaintiff himself, the total weekly amount allotted for the basic services should be paid in this instance.

Therefore, in addition to the $54.30 per week maintenance payment for food, the defendant shall pay to the plaintiff $21.53 for basic utilities as a part of maintenance. Therefore, the appropriate amount of maintenance to be paid to the plaintiff in this case is $75.83 per week retroactive to the beginning date of the provision of maintenance.

The final issue raised by the defendant is whether it should be entitled to offset any payments it is ordered to pay against a "credit balance" for so-called gratuitous payments made for health insurance and additional wages. (*See* findings of fact 4 & 5).

The case of *Harper v. Zapata Off–Shore Co.,* 741 F.2d 87 (5th Cir.1984), describes these "gratuitous" payments or advances as a type of settlement procedure. In that case, the district court did not allow the advances to be considered maintenance payments in disguise, and the jury was not allowed to credit the advances towards Zapata's maintenance payments. *Id.* at 89. Whether these payments are truly gratuitous, or are amounts which may be credited against a plaintiff's recovery under the Jones Act are matters which this court can take up at the time of the resolution of the remaining claims in this lawsuit.

At this point in time, and keeping in mind the requirement that the right to maintenance and cure be construed liberally, we conclude that the defendant should not be entitled to credit those payments. The gratuitous payments will certainly be an offset with respect to any other damages the plaintiff is entitled to recover under the Jones Act. Therefore, the defendant will not be penalized by failing to credit them at this time, unless ultimately the plaintiff does not prevail on any other cause of action in this lawsuit. If that should be the case, the payments made by the defendant will be in fact what they are claimed to be—gratuities. There are many intangible benefits which flow to an employer who is gracious with its employees, and the court is certain that those benefits will enure to the defendant. Therefore, the defendant's request that the maintenance payments be credited against gratuities is **DENIED**.

Therefore, the plaintiff's motion is **GRANTED, in part**. The defendant shall make the payments required (the difference between $75.83 and $56.00) per week for each week between the date of onset and the date of the administration of this order within 30 days of the date of this order.